INMAN BROS. v. DUDLEY & DANIELS LUMBER CO.

(Circuit Court of Appeals, Sixth Circuit. June 5, 1906.)

No. 1,469.

1. SALES—CONSTRUCTION OF CONTRACT—DESCRIPTION OF PROPERTY SOLD.
Defendants contracted to sell and deliver to plaintiff at agreed prices all the lumber they then had on hand at their mill and loading station, which they "estimated" at about 800,000 feet of oak and 300,000 feet of gum. Also their "entire cut" of lumber during the year 1903, "estimated to be 1,500,000 feet, more or less," of oak, including the stock on hand, and 1,000,000 feet, more or less, of gum. *Held,* that such contract was not one for the sale of a definite quantity of lumber, but of defendants' entire stock on hand at their mill and shipping station, much or little, and of whatever quantity they should cut during the year 1903, regardless of departures from estimates, in the absence of fraud.

2. SAME—ACTION FOR BREACH OF CONTRACT—EVIDENCE.
In an action for the breach of such contract by defendants by their failure to deliver the lumber, evidence offered by them to show the quantity actually cut in 1903 was material on the question of damages, and its exclusion was error.

3. APPEAL AND ERROR—ERROR IN EXCLUSION OF EVIDENCE—PRESUMPTION OF PREJUDICE.
Where plain error was committed in the exclusion of evidence on the trial of a case, the judgment should be reversed, unless it is clear that the error was not so prejudicial as to exclude every reasonable doubt.

4. EVIDENCE—LETTER FROM AGENT TO PRINCIPAL—ADMISSIBILITY AGAINST THIRD PERSON.
A letter from an agent to his principal, reporting an interview between the agent and a third person which occurred some time before, is merely a narrative of a past transaction, and is not admissible as independent evidence against such third person, nor to corroborate the testimony of the agent.
[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 354.]

5. WITNESS—CORROBORATION—PREVIOUS STATEMENTS.
The mere fact that there is a conflict of testimony between two or more witnesses does not authorize the corroboration of one by his former statements.
[Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 1085, 1284.]

Error to the Circuit Court of the United States for the Western District of Tennessee.

This was an action at law to recover damages for the breach of a contract for the purchase and sale of certain lumber. The contract was as follows:

"Newbern, Tenn., Nov. 24, 1902.

"This contract, entered into this the 24th day of November, 1902, by and between Inman Brothers, party of the first part, of Newbern, Tennessee, and the Dudley & Daniels Lumber Co., of Grand Rapids, Michigan, party of the second part. Inman Brothers, party of the first part, do hereby give the exclusive sale to the Dudley & Daniels Lumber Co., party of the second part, all dry and green lumber they have on hand at their Riverside Mills and also their loading station, Newbern, Tennessee. Their estimate of oak lumber on hand at present being about 800,000 feet, of which 50,000 feet may be quartered red oak, 750,000 feet plain sawed red oak, with possibly a small quantity of white oak. Gum, 300,000 ft., all estimates being log run. Dudley & Daniels Lumber Company, party of the second part, do hereby agree to

146 F.—29

accept all lumber f. o. b. cars, Newbern, Tennessee, and settle for the same hereinafter specified, at following prices: 1' and 2' plain sawed red oak f. o. b. Newbern, Tenn., per M. ft., $25.00. Common plain sawed red oak f. o. b. Newbern, Tenn., per M. ft., $14.50. 1' & 2' quartered red oak f. o. b. Newbern, Tenn., per M. ft., $30.00. Common quartered red oak f. o. b. Newbern, Tenn., per M. ft., $19.50. Gum log run red oak f. o. b. Newbern, Tenn., per M. ft., $11.50. For surfacing gum or other lumber, one or two sides, per M. ft., $1.50. Dudley & Daniels Lumber Company agree to settle for all lumber loaded and shipped, at the end of each week with New York Exchange, less 2 per cent. It is also agreed that Dudley & Daniels Lumber Co., party of the second part, are to receive the entire cut of the party of the first part for and during the year 1903, barring accident by fire or otherwise, or as soon thereafter as the cut from this mill can be furnished by the said Inman Brothers estimated to be 1,500,000 feet, more or less, plain and quartered red oak, including the stock on hand, also 1,000,000 feet, more or less, of log run gum at above prices. Inman Brothers, party of the first part, also agree to saw their cut of oak and gum henceforth to order and by specifications of Dudley & Daniels Lumber Co., so long as they may be financially responsible for their contracts during the lifetime of this agreement. Inspection to be mutually satisfactory, all parties to be governed by the National Hardwood Association rules of inspection."

Some 50,000 or 60,000 feet of oak lumber of various grades was delivered when the defendants, as averred, refused to make any other or further deliveries. Thereupon this suit was brought.

The defenses, in substance, were these: First, that the contract by mutual agreement was rescinded; second, that the Dudley & Daniels Lumber Company became financially irresponsible, and defendants therefore justified in refusing to go on with the agreement; and, third, that defendants were not damaged by the breach, if any there was.

There was a jury and verdict for the plaintiff, and a judgment for $7,565. Defendants sued out this writ of error.

Cockroft & Cabell, N. L. Scoby, J. H. Malone, and T. K. Riddick, for plaintiffs in error.

W. H. Carroll, Johnson & Johnson, S. Grainger Latta, and Albert W. Biggs, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

1. The defendants sought to show the actual amount of lumber cut at Riverside sawmill during the year 1903. This evidence was objected to and excluded upon the ground that the contract was for the sale of a definite amount of lumber, and that it was immaterial whether the lumber actually cut during 1903 was more or less than the amount contracted for. This was error. The contract was for the sale of the lumber which Inman Bros. had on hand at their mill and at their shipping station, and also for the sale of such lumber as they should cut during the year 1903. The lumber on hand was all sold, whether much or little. The contract "estimated" that the quantity so on hand and sold was "about" 800,000 feet, "of which 50,000 may be quartered red oak, 750,000 feet plain sawed red oak, with possibly a small quantity of white oak; gum 300,000—all estimates being log run." By another and distinct provision Inman Bros. agreed to sell their "entire cut for and during the year 1903, barring accident by fire or otherwise, * * * estimated to be 1,500,000 feet, more or

less, plain and quartered red oak, including the stock on hand, also 1,000,000 feet more or less, of log run gum at above prices." Such a contract is not an engagement to sell a definite or certain quantity of lumber; in which case the terms "about" and "more or less" would only provide against immaterial, accidental variations. Moore v. U. S., 196 U. S. 158, 25 Sup. Ct. 202, 49 L. Ed. 428, is an illustration. There the agreement was to furnish and deliver "about 5,000 tons of coal." The contractor delivered 4,634 tons, and then brought and tendered 366 additional tons. This the government refused to receive, when the contractor sold it at a loss and sued for damages. The court said the obligation was to receive "about 5,000 tons," and that the only question was whether 366 tons less than 5,000 tons was "about 5,000 tons." It was held that the difference was too great, and that "the addition of the qualifying words "about," "more or less," and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, weight, or measure." But the case at bar falls under different principles altogether. The defendants agreed to sell and deliver at an agreed price all their "dry and green lumber" then on hand at their mill and at their shipping station. This lumber so on hand constituted a definite and ascertained pile or stock of lumber, as much so as if the sale had been of all the corn in a particular pen or the cotton in a particular ginhouse. This definite lot of lumber was "estimated" at 800,000 feet of oak and 300,000 feet of gum. But this was not a sale of 800,000 feet of oak or a sale of 300,000 feet of gum, or a sale of "about" 800,000 feet of one kind and "about" 300,000 feet of the other. It was the sale of the entire stock of lumber on hand, much or little, and, in the absence of fraud, the purchaser was bound to take all and the seller to deliver all, regardless of departure from estimates. The same is true about the lumber to be cut during 1903. The sale was not of a definite number of feet to be cut then, but of the "entire cut" of that year. This cut was estimated at 1,500,000 feet of oak, including the 800,000 estimated as on hand already cut, and the cut of gum was estimated at 1,000,000 feet. But this was an agreement to sell and deliver the entire cut of 1903, whatever it should be. The contract applied, therefore, to the specific lots of lumber identified as the lumber green and dry at the mill and the shipping station, and to the "entire cut" of lumber by the mill during the year 1903, and the estimation of the amount of lumber on hand or which might be cut did not constitute a warranty. Good faith was all that was required from the parties in making the estimate, or in the future operation of the mill. Brawley v. U. S., 96 U. S. 168, 24 L. Ed. 622; Rib River Lumber Co. v. Ogilvie, 113 Wis. 482, 89 N. W. 483.

The plaintiff in error made more than one effort to show the cut of lumber by its Riverside mill during 1903. One Harrington, who stated that he had hauled all of the logs cut at that mill during that and other years, was asked as to the logs hauled by him to be cut during 1903. Objection was made upon the ground that the contract was for the sale and delivery of a definite number of feet. The court excluded the evidence, saying:

"I think if you are liable at all you would be liable for the amount you sold here; or the difference between the amount you furnished and the amount you agreed to sell. I don't think it would make any difference how much lumber he hauled there."

S. P. Inman, one of the defendants, was subsequently asked to state what the entire cut of the Riverside Mills during the year 1903 was. Thereupon exception was again interposed, Mr. Biggs, attorney. for plaintiff, putting his objection upon the ground that "under the contract they were to cut and furnish so much, and what they did cut was immaterial." The ruling made when evidence as to the amount of logs hauled to the mill in 1903 was offered was again repeated and the evidence excluded. The defense now made for this ruling is, not that the court did not misconstrue the contract, and commit error in excluding evidence of actual cut of mill, but that the error was harmless, and therefore not ground for reversal. That error is always presumed to be prejudicial is elementary. Nevertheless, it is an established rule in error proceedings that error which was not prejudicial will not justify a reversal. But in Deery v. Cray, 5 Wall. 796, 807, 18 L. Ed. 653, the court said that, "when the application of this rule is sought, it must appear so clear as to be beyond doubt that the error did not and could not have prejudiced the party's rights." This language has more than once been repeated in subsequent cases (Vicksburg, etc., R. R. v. O'Brien, 119 U. S. 99, 7 Sup. Ct. 118, 30 L. Ed. 299), and was applied by this court in Standard Life Ins. Co. v. Sale, 121 Fed. 666, 57 C. C. A. 418.

The argument that the exclusion of evidence as to number of feet actually cut during 1903 at the mill, which was deliverable under this agreement, was immaterial and the error harmless is predicated upon the assumption that the defendants below did not deny that they had on hand at the making of the contract the estimated amount of lumber referred to in the contract, namely 800,000 feet of oak lumber and 300,000 feet of gum lumber, and that the evidence which was offered and which was excluded showed that the cut of oak lumber during 1903 was 714,000 feet, and the cut of gum in excess of the 1,000,000 feet estimated as the cut of the season. The damages recoverable by the plaintiff, if any, were dependent upon the actual quantity of lumber on hand when the contract was made, plus the quantity cut at Riverside Mill during 1903. If there was on hand 800,000 feet of oak, and the cut of 1903 amounted to 714,000 feet or more, plaintiff would be entitled to the difference between the market value of 1,514,000 feet and the contract price of that amount, less only the lumber actually delivered. So in respect to the gum. If the amount on hand was 300,000 feet, and the cut of 1903 was 1,000,000, more or less, the damage would be calculated upon the difference between the market and the contract price of the aggregate of gum on hand and gum cut in 1903. It is most obvious that this was not the view of the learned court or of the counsel for the plaintiff below. Their view then was that Inman Bros. had sold in any event 1,500,000 feet of oak and 1,300,000 feet of gum, and that it was a matter of no moment whether they had on hand any part of this

aggregate, or whether the mill cut any at all during the year. Page after page of the transcript is filled with proffers of evidence to show the cut of 1903, and colloquies between court and counsel as to the relevancy of such evidence. That it was irrelevant if the court's interpretation of the contract was right must be conceded; that it was pertinent and material if the court was wrong is equally evident. But counsel say that the evidence of Harrington, which was excluded, was to the effect that he had hauled 1,500,000 feet of gum logs to the mill during 1903, and that this evidence, if admitted, would thus have shown a larger cut than the aggregate amount of gum lumber claimed by plaintiff under the agreement, and would or might have enlarged the damages recoverable by plaintiff. This may be true as to so much of the contract as related to gum lumber, though there was evidence tending to show that the contract price for gum was in excess of the market price. If this latter contention was credited by the jury, it would have cut down the aggregate damage recoverable for breach of a contract which was an entirety. The witness S. P. Inman testified that the price of the lumber sold or contracted to be sold would depend upon its grade or quality. In reference to the oak lumber receivable under this contract the following occurred during his examination by plaintiff's counsel:

"Q. Under this contract, the timber specified therein, I will ask you, Mr. Inman, what per cent. of that oak lumber was one and two plain sawed? A. What per cent? Q. Yes. A. One and two? Q. Yes, sir. A. I can't tell you without referring to a memorandum I have. A. You may refer to that memorandum. A. I would have to figure out the per cent. Q. Give the number of feet then of each kind? A. I can give it in round numbers, 47,181 feet of firsts and second, plain. Q. Is that oak, A. Oak, and 187,590 feet of No. 1 common plain oak; 322,335 feet of No. 2 plain oak; 27,773 feet of 1 and 2 quartered; 47,049 feet of No. 1 quartered; 89,902 feet of No. 2 quartered— aggregate 714,000. Q. I will ask you the same question with reference to the gum? A. There was 1,748,403 feet of log run, I suppose."

After having thus testified, he was asked by his counsel, Mr. Cockroft, as follows:

"Q. Mr. Inman, this contract now specified that you are to ship to Daniel & Dudley Lumber Company your entire cuts from your Riverside Mill during the year 1903, I will ask you what that cut amounted to in feet and grade, if you have it?"

This was objected to, as before stated, upon the ground that it was immaterial how much the cut amounted to, and the witness was not allowed to answer.

Defendant in error now insists that this evidence shows that the actual cut of 1903 was 714,000 feet of oak lumber, and that in the absence of evidence that the oak lumber on hand at date of contract was less than the quantity estimated (800,000 feet) the court will assume that there was 800,000 feet on hand, which, added to 714,000 feet cut in 1903, would aggregate 1,514,000 feet of oak, and thus exceed the estimate of the contract. There was no admission by counsel that the oak lumber on hand at date of contract was 800,000 feet, nor was there any evidence to that effect. In view of the ruling of the court excluding evidence of the actual cut of the mill during 1903, it

would have been folly to offer evidence of the actual amount of oak lumber on hand at mill and shipping station. If it was immaterial what the actual cut of 1903· was, it was equally immaterial what the actual amount of lumber on hand at date of contract. There is no sufficient ground for assuming that the witness Inman meant that the 714,000 feet of oak lumber about which he had been testifying was lumber cut during 1903. He was called upon to testify as to the different grades of oak deliverable under· "this contract," and it is not reasonable to assume that he would confine himself to a detailed description of that which was cut during 1903, and omit all mention of that which was on hand. It was as essential in fixing the damage to know ·the different grades of that on hand as of that subsequently cut. The subject about which the witness was interrogated was the difference between the contract price and the market price of the lumber sold under "this contract"—a contract which covered lumber on hand and lumber to be cut. It would be most remarkable that he should go into details as to the varying quality and price of that cut in 1903, and omit all reference to that which was stacked at the mill and station, which must have likewise varied in quality and value. Still more remarkable that astute counsel for plaintiffs should struggle with persistence and much argument to exclude evidence of the amount of the cut of 1903 if they supposed the 714,000 feet of oak lumber referred to by Inman was the cut of that year, and that there was no denial of the correctness of the estimate of that on hand. To support their contention that the 714,000 feet classified by the witness Inman included only the oak cut in 1903, and that the absence of direct evidence or the offer of direct evidence as to the quantity of lumber on hand justifies the presumption of the correctness of the contract estimate of the lumber on hand, they refer to an affidavit made by the defendant Inman upon the motion for a new trial. But that by no means settles the question. It is only made the more apparent that when that affidavit was made no such contention as that now advanced was in the minds of any one of the parties. The materiality of the evidence excluded was made to turn upon the meaning placed by the court upon the contract, and not upon its pertinence in arriving at amount of damage, if that was not the right interpretation of the contract. Inman in his affidavit figures out the difference between market price and contract price upon two theories. One, that the agreement was for the sale of lumber on hand and the lumber produced during 1903. Upon that theory he puts down the quantity of oak deliverable at 714,000 feet. Now, if that did not include oak on hand and oak sawed in 1903, his estimate of aggregate difference between market and contract price would be of no importance. The other theory upon which he figures is that plaintiff was entitled to demand 1,500,000 feet. of oak and 1,300,000 feet of gum. That he did not make a distinction between the amount of oak lumber on hand and that subsequently sawed was doubtless due to the way in which the future cut of oak is referred to. After specifically contracting for the sale of oak and gum on hand, the oak being estimated at 800,000 feet, the contract then provides as follows:

"It is also agreed that the Dudley & Daniels Company are to receive the entire cut of the first part for and during the year 1903, * * * estimated to be 1,500,000 feet, more or less, plain and quartered red oak, including the stock on hand; also 1,000,000 feet, more or less, of log run gum at above prices."

The inclusion of the estimated 800,000 feet of oak on hand as a part of an estimated mill output of 1,500,000 feet doubtless led to an inclusion of the oak on hand with the mill cut by the witness.

We have no right to speculate as to the prejudicial effect of a plain error. If its nonprejudicial effect is not so clear as to exclude every reasonable doubt, we should reverse. That grave doubt at least exists of the aggregate of oak lumber on hand and cut during 1903 is enough to require a new trial. One of the defenses was that the parties, the plaintiff acting by its agent, D. W. Beard, had, on March 31, 1903, mutually agreed upon a rescission. The plaintiff company, as a part of its original evidence, though after Beard and other witnesses had been cross-examined as to the alleged agreement of recission of March 31st, offered in evidence a letter written by Beard to plaintiff on the night of that day, purporting to be a report of the occurrences of the day with the defendants, and a statement of certain complaints made by the plaintiff as to the financial responsibility of the defendants. The letter said nothing in respect of an agreement, nor of any proposition to rescind the contract. When offered it was objected to as a mere narration by plaintiff's own agents of the occurrences of the day with defendants. The purpose of offering it was thus stated by Mr. Biggs, counsel for plaintiff, who said:

"The purpose of introducing this letter is this: As I understand, the contention of these parties is that on that day Mr. Beard went there and canceled this contract, but he denies that he canceled the contract. He also states what occurred there that day—what occurred about his offer to attach sight drafts to bill of lading. The proof is that, as soon as the conversation was over, he went to Dyersburg, and wrote a letter to the Dudley & Daniels Company, which letter we want to introduce for the purpose of showing that he makes this report to the company of what occurred."

The court thereupon ruled that the letter was competent. That a letter written by an agent to his principal concerning the business of the latter is not evidence against a third person is elementary. Unless admissible as a part of the res gestæ, such a narrative would come within the definition of res inter alios acta. Written at a different place, and hence after the interview between Beard and Inman, it was nothing more than a narration of a past transaction. Freeborn v. Smith, 2 Wall. 160, 17 L. Ed. 922; Dwyer v. Dunbar, 5 Wall. 318, 18 L. Ed. 489; United States v. Corwin, 129 U. S. 381, 9 Sup. Ct. 318, 32 L. Ed. 710; Ins. Co. v. Guardiola, 129 U. S. 642, 9 Sup. Ct. 425, 32 L. Ed. 802. Such a letter or report by an agent to his principal about the latter's business is neither independent evidence against a stranger, nor admissible to corroborate the evidence of such agent. In case last cited the question was as to the number of hogsheads of sugar shipped. Letters written by the plaintiff's shipping agent to them at the time of their respective shipments, and stating number of hogsheads shipped, were admitted over objection. For this the judgment was reversed, the

court saying that the letters "were incompetent, either in themselves or in corroboration of.the testimony of the agents, to prove the facts .recited in the letters against third persons." The letter of Beard was not admissible to refresh memory of witness. He had already testified to the matter substantially as detailed in his letter, and needed no refreshment. Bates v. Preble, 151 U. S. 149, 14 Sup. Ct. 277, 38 L. Ed. 106.

In Vicksburg, etc., R. R. v. O'Brien, 119 U. S. 99, 7 Sup. Ct. 172, 30 L. Ed. 299, a statement made by a physician as to the nature and extent of injuries received by a passenger, and made when treating him, for the purpose of giving information to others, was held to have been erroneously admitted against the carrier, although attached to a deposition by the physician, who testified that it correctly stated the condition of the passenger at the time referred to. Nor was the letter offered or used to fix a disputed date, as in Dunlap v. Hopkins, 95 Fed. 231, 37 C. C. A. 52. There are certain cases in Tennessee holding that when there is a claim that a witness' testimony is a recent fabrication it is admissible to show consistent statements before there was any motive to falsify (Queener v. Morrow, 1 Cold. [Tenn.] 124), or when impeached by proof of contradictory statements (Hays v. Cheatham, 6 Lea [Tenn.] 1; Glass v. Bennett, 89 Tenn. 480, 14 S. W. 1085).

Without considering the question as to the weight of authority touching the admissibility of consistent statements at a time anterior to a motive for not speaking the truth, when a witness has been impeached by contradictory statements, it is enough to say that there was no such impeachment of Beard. There was a conflict between his version of a conversation and that of others, but we do not understand that a mere conflict between two or more witnesses will authorize the corroboration of one by his former statements. 2 Elliott on Evidence, §§ 991, 994, and Vicksburg R. R. v. O'Brien, cited above, seems conclusive upon such a question.

It has been suggested that Beard was a stranger, and surrounded by friends of the defendants and that they used indefensible threats, and that they have now conspired to testify as to what he did and said when alone and defenseless, and that under such circumstances his report, made shortly thereafter to his principal, should be admitted to corroborate a witness so situated. The suggestion when made in argument seemed to carry some weight, but an examination of the record shows that whatever threatening language may have.been used was used long·after the occasion when the alleged agreement for a rescission was made, and, moreover, that any such threats were made, not to Beard, but to his principal, Dudley, who, in company with his lawyer and Beard, had gone to the business house of Inman Bros. to learn why they refused to carry out the contract. The parties were then at arms' length, and plaintiff was preparing to enforce its rights. This affair of words was on April 11, 1903. The alleged rescission was on March 31, 1903, and Beard's letter was written on March 31, 1903. It is plain that an occurrence 11 days after the letter can supply no legal ground for admitting it as corroborative evidence.

For the errors noticed, the judgment must be reversed, and a new trial awarded.