## HODGE v. CITY OF FT. WORTH.
### (No. 8589.)

(Court of Civil Appeals of Texas. Ft. Worth. April 14, 1917. Rehearing Denied June 9, 1917.)

1. CONTRACTS ☞147(1)—EVIDENCE ☞448— PAROL EVIDENCE — CONSTRUCTION OF CONTRACT.

The primary rule in the construction of contracts is that the intention of the parties is to be . sought and carried out whenever possible, and where the contract is in writing and the language is unambiguous, such intention must be ascertained from the language of the contract as written; but where language is ambiguous, explanation of such ambiguities is permitted by parol testimony.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 730; Evidence, Cent. Dig. §§ 2066–2082, 2084.]

2. EVIDENCE ☞450(7) — PAROL EVIDENCE — AMBIGUITIES.

A contract calling for clearing a basin to the height of 608 feet above sea level, containing approximately 1,250 acres, is ambiguous, where in fact the line stated includes an excess of 2,-900 acres. .

3. CONTRACTS ☞350(1)—CONSTRUCTION—EVIDENCE—SUFFICIENCY.

Evidence *held* to show that a contract providing for clearing a basin for a reservoir was made upon the basis of acreage, and not the flow line, so that the contractor could not recover for acreage cleared in excess of that named.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1819, 1822, 1823.]

Appeal from District Court, Tarrant County; R. B. Young, Judge.

Action by C. T. Hodge against the City of Ft. Worth. Judgment for plaintiff in part . only, and he appeals. Affirmed.

Thompson & Barwise and J. C. Terrell, all of Ft. Worth, for appellant. T. A. Altman and B. L. Agerton, both of Ft. Worth, for appellee. .

BUCK, J. Suit .was instituted by C. T. Hodge against the city of Ft. Worth to recover the balance alleged to be due for work and labor performed under a contract with said city in the clearing of what is known as the reservoir site up to the 608-foot line above the sea level, and to recover damages from the city for the alleged failure to permit him to clear the remainder of said reservoir site embraced within said measurements.

The cause was tried before the court without the intervention of a jury, and judgment rendered for plaintiff as follows: (1) In the sum of $1,729.61, the amount found to be due on estimates and retained by said city; (2)˙ the sum of $554.01, the amount found to be due for clearing other land; (3) the amount of $250 found to be due for 5,000 fence posts

───────────────

sold and delivered to the city by plaintiff; and (4) the balance found to be due for work in clearing the river channel, in the sum of $161.75, making a total of $2,695.37. A credit thereon of $100 was allowed the city, because by reason of the city's failure to furnish the material to build a fence which appellant had contracted to build, the appellant was not required to spend for labor in erecting said fence the amount named. Interest was allowed on $2,595.37, from October 12, 1912, amounting at the time of the suit, to wit, April 25, 1916, to $3,145.98. The plaintiff has appealed.

The controversy arises by reason of the wording of the contract between plaintiff and defendant, plaintiff contending that the contract was intended to cover and did cover the work of clearing the entire reservoir site, including all the lands both below and above the nine-mile bridge inundated by reason of the construction of the dam, up to the 608 flow line. The contention of the city is that it should not be held liable for the clearing of more than approximately 1,250 acres, which both parties agreed and so stated in the contract, constituted the acreage contemplated by the contract, and that in no event could it be held liable for the profits claimed by plaintiff in the way of damages on the land above the nine-mile bridge, and which lands the plaintiff was not permitted by the city to clear. On July 24, 1911, the city advertised for bids "for clearing the West Fork reservoir site of trees, undergrowth, etc., according to specifications on file in the board of engineers' office." These specifications provided:

"The work to be done consists of clearing the West Fork reservoir site up to the flow line, as staked out at elevation of 608, of all trees, logs, stumps, brush and other undergrowth, to the approval and satisfaction of the board of engineers."

By a proposition in writing dated August 15, 1911, appellant offered to clear the land, in accordance with the specifications ,with the board of engineers on file, for $19.25 per acre. This bid was recommended for acceptance by the board of engineers on August 22, 1911, said recommendation stating:

"It being further understood that C. T. Hodge understands that all of the land is not now purchased, and that the work shall progress under the direction of the board of engineers on such lands as are acquired and as may be acquired from time to time."

This report was adopted by the commissioners of the city, and the contract awarded to said Hodge. The contract between the city of Ft. Worth, styled party of the first part, and C. T. Hodge, styled party of the second part, dated September 21, 1911, provided, in part, as follows:

"First. Party of the second part agrees to clear the West Fork reservoir site, belonging to the party of the first part, or hereinafter to be acquired consisting of approximately 1,250 acres up to the flow line as staked out at an elevation of 607 feet [it is agreed that this number should be 608, and will be hereinafter so treated], of all trees, logs, on ground, but not in river channel, brush and other undergrowth (permanent improvements, houses, barns, outhouses, etc., excepted) to the approval and satisfaction of the board of engineers of the party of the first part. * * *

"Sixth. Party of the second part is to furnish bond in the sum of $5,000, conditioned upon the faithful performance of this contract and upon the payment by him to the full satisfaction of all claims for damage of every character whatsoever arising from or connected directly or indirectly with any work done by him or his agents or employés under the provisions of this contract.

"Seventh. Party of the second part is to begin work clearing said reservoir site within ten days from date of acquiring all said land to be cleared, and all said work is to be completed within eleven months (or September 1, 1912) from said date and all timber and wood of every character belonging to the party of the second part shall be removed by him from said reservoir site above elevation 607 within said period. Extraordinary weather or conditions beyond control of party of second part shall extend the time of completion of this contract and the removal of said timber and wood to the extent of the time that such weather or conditions continue. * * *

"Ninth. Party of first part is to acquire by purchase or condemnation the land to be cleared as expeditiously as possible and consistent, in order that progress of the work may not be delayed."

Plaintiff filed his bond, dated September 22, 1911, with the Commonwealth Bonding & Casualty Insurance Company as surety, said bond providing, in part, as follows:

"The condition of the above obligation is such that the said principal herein has entered into a certain contract with the said city of Ft. Worth, bearing date of September 21, 1911, for the performance of certain work in clearing off the West Fork reservoir site.

"Now, if the said principal herein shall faithfully do and perform all the obligations imposed on him in said contract, and shall save the said city harmless from any damage or injuries arising from, or connected directly or indirectly with, any work done by him or his agents or employés under the provisions of said contract, then this obligation shall be null and void; otherwise to remain in full force and effect."

The court in his findings of fact found that before the signing of any contract for the doing of said work, the timbered area within the lines of the reservoir as then proposed was estimated under the direction of the board of engineers, and that said estimate showed said timbered area to consist of approximately 1,250 acres; that at the time said contract was made and said work begun there were no stakes indicating where the 608 line extended, but the line of 615 feet elevation was staked on the ground at said time and showed said 615 line to extend no further than the nine-mile bridge, and no lines had been marked north of said bridge; that said C. T. Hodge cleared 1,411 acres of land upon the reservoir site, and within the 608 line, which were accepted and paid for by the city of Ft. Worth, and that said Hodge cleared an additional amount of 599 acres, and that said work of clearing said 599 acres was accepted by the board of engineers of the city, and that proper estimates.

were given said Hodge for same; that said Hodge further cleared 28.78 acres of land for which he was entitled to payment in the sum of $553.91, and that said work was duly accepted by the city of Ft. Worth; that a controversy having arisen between the parties to the contract as to whether or not said contract was applicable to the work of clearing the river channel within the reservoir site, a separate contract was made, by the terms of which Hodge was to be paid for the clearing of the river channel and the removal of growing timber therein, for which he was entitled to $161.75. The court further found that it was within the contemplation of the parties to the contract that under same approximately 1,250 acres of land should be cleared, and that all the lands for the clearing of which Hodge was entitled to recover under his contract, and for which he was employed to clear, lay south of what is known as the nine-mile bridge; that on June 23, 1913, the city notified the plaintiff not to clear any additional land until instructed so to do, and that thereafter the city did not instruct the plaintiff to clear any additional land; that it was not within the contemplation of the parties to the contract that said plaintiff should clear any portion of the reservoir site flooded by water lying north of said nine-mile bridge; that there lay north of said bridge 932 acres of timber within the 608 flow line; that on 725.5 acres of this there would have been a profit of $7.50 per acre; that upon 32 acres cleared, known as the Murphy tract, there would have been a profit of $9.25 per acre, being the difference between what it cost to clear the same and the contract price as stipulated in the contract with Hodge; that upon 10.8 acres of land cleared there would have been a profit of $6.75 per acre, amounting to $72.-90; that on 44.9 acres of land cleared the cost of clearing same was $13 per acre, and a profit of $280.62 would have been realized under plaintiff's contract; that 20 acres of land was cleared by the city at a cost of $10 per acre, and that the profit to Hodge on same would have been $185. Other parties cleared various tracts of land north of the nine-mile bridge, under separate contracts with the city, on which the court found that Hodge would have made a profit, if he had been permitted to clear the same. The court found that plaintiff was not entitled to recover for various tracts of land cleared by other parties under contracts with the city, lying north of the nine-mile bridge; that Hodge was ready, able, and willing to clear said land, but was not permitted to clear the same by the city.

Appellant has presented in his brief six assignments of error; the first directed to the failure of the court to render judgment for him for the profit on 727.5 acres lying north of the nine-mile bridge and included in the 608 line at $7.51 per acre; the second,

to the refusal of the court to render judgment for plaintiff for $19.25 per acre upon 20 acres of land, known as the Cook tract, lying south of the nine-mile bridge, because, as asserted, appellant had already contracted with other parties to clear said land according to his contract with the city free of cost to him, that is, for the wood growing thereon; third, to the refusal of the court to award judgment for plaintiff for profits claimed in clearing five acres, known as the Camp site, near the dam; fourth, to the findings of fact Nos. 18 and 19, in which the court found that it was in the contemplation of the parties to the contract that approximately 1,250 acres of land should be cleared, and that all of the land which Hodge was employed to clear lay south of the nine-mile bridge. The fifth assignment is directed to the finding of the court that it was in the contemplation of the parties to the contract that the overflow line did not extend beyond said nine-mile bridge, and that said contract was only intended to embrace the woodland south of said bridge. The sixth assignment is directed to the finding of fact by the court in the seventh paragraph of his findings, which was that before the signing of any contract the timbered area within the lines of the reservoir as then proposed was estimated by the board of engineers and by the parties to the contract to consist of approximately 1,250 acres.

[1] But we think all of these assignments present but one question, and that the question of their sufficiency depends upon whether the court correctly held that it was within the contemplation of the parties to the contract that the land to be cleared consisted of approximately 1,250 acres. It is elementary that the primary rule in the construction of contracts is that the intention of the parties is to be sought and carried out whenever possible; that where the contract is in writing and the language is unambiguous, such intention must be ascertained from the language of the contract as written; that where language is ambiguous, explanation of such ambiguities is permitted by parol testimony.

[2, 3] It appearing that the acreage of the land to be cleared which lay south of the nine-mile bridge and lying within the flooded area and within the 608 flow line exceeded 2,000 acres, and that that portion lying north of the nine-mile bridge, within the description mentioned, amounted to some 932 acres, we think the court correctly held that the contract as written was subject to explanation for ambiguity. As evidence supporting the court's conclusion that in placing in the contract the estimate of the land to be cleared at approximately 1,250 acres, it was in the contemplation of the parties that the agreement was upon the basis of acreage rather than upon the basis of the total inundation and up to the 608 flow line, the record discloses that a map of the proposed reservoir

site was made under the supervision of the board of engineers on June 19, 1911, which showed the reservoir site to extend only to the nine-mile bridge. J. D. Trammell, chairman of the board of engineers, testified that at the time of the execution of the contract between the city and Hodge—

"we had staked out the contour line at the elevation of 615 feet the entire distance around the reservoir and as far up as the nine-mile bridge —the old nine-mile bridge. At that time no surveys had been made of the contour lines run in connection with this reservoir above the nine-mile bridge. We had made some surveys for another reservoir above the ten-mile bridge and around the ten-mile bridge, but it was some five or six miles up the stream from the nine-mile bridge. That was in connection with other reservoir sites or dam sites, you will understand, and not in connection with this one that was afterwards actually built. No such surveys or contour lines had been run concerning the site mentioned in this contract. Prior to September 21, 1911, two engineers had been sent out in connection with the timbered area within the reservoir site as then staked out. * * * After the map of the reservoir site had been made which they were sent out to make, they were then sent out to make an estimate of the number of acres of land in the flooded area up to the nine-mile bridge, and at the time of the execution of this Hodge contract on September 21, 1911, there had been made an estimate of the number of acres of timbered land within the flooded area up to the nine-mile bridge, and that estimate was 1,250 acres. * * * The information I had as to the timbered area was not derived entirely from information given me by Adams and Orlop [the engineers who made the survey above mentioned]. I had been over and about the reservoir site, and I had some knowledge relative to the amount of land cleared and not cleared just from riding over and about it. My information derived in that way was not accurate at all, and I considered the information I got from these engineers as to the actual acreage of the timbered land more accurate than my own estimate would have been which was just an approximation from my observation. * * * As I say, the amount of timbered area as shown by the work of these engineers within the flooded lines was 1,250 acres up to the nine-mile bridge, and that was very close to the approximation which I had in my mind. I had been looking over the situation and I considered that more than half of the land had been already cleared and was in cultivation. These measurements on this map which the city has introduced in evidence were obtained before the contract with Mr. Hodge was made, and the board of engineers had the information contained in this map at the time they entered into the contract with Mr. Hodge. The acreage of 1,250 acres was based on the contour line of 609 feet, and the area of the 608 feet contour line would be slightly smaller than the 609 contour line; the 609 contour line would go a little higher up the hillside. This map was made under the supervision of the board of engineers, and it is dated June 19, 1911. * * * My recollection is that we furnished Mr. Hodge with a copy or copies of this map about the time the contract with him was executed. I am pretty sure we furnished him copies of this map. We did not furnish him with any map showing the lands to be cleared above the nine-mile bridge; as a matter of fact, we had no map of the lands above the nine-mile bridge."

As indicating that Hodge understood the contract to contemplate the clearing of approximately 1,250 acres, on July 29, 1912, he wrote the board of engineers as follows:

"On July 20th, I finished cutting all the timber in the water lines of the reservoir on land owned by the city and discharged my Mexican cutting gangs. There are other timber lands to be cut in the water lines, but the city has not acquired title to same. Please issue me a written release as to any responsibility for clearing the unpurchased land. When your measurements are completed they will show that I have done over 50 per cent. more clearing than the contract originally called for. Please issue to me a written extension of time proportionate to the excess, and the original time I had. I am needing the money I have tied up in the river channel, and wish you would arrange so I can get same."

And on November 27, 1912, he wrote said board of engineers the following letter:

"The bonding company who made my bond for $5,000 on clearing the reservoir claim this bond was made on the time limit of the contract and based on approximately 1,250 acres, and they are after me for a release, and request that I ask you gentlemen to write them a release. Within the year the bond had to run, I had downed over 2,000 acres and cleared according to contract 1,491.60 acres. There has been since September 22d a good deal more land cleared up, and the entire tract is practically completed with the exception of the Cetti bottom. Kindly give this your attention."

On December 20, 1912, he wrote to said board of engineers a letter, which reads, in part, as follows:

"In regard to releasing bond: I obligated myself to clear approximately 1,250 acres and within lines 607, and do the work of building 15 miles of fencing; this work to be completed within a given time. I recognized the obligation imposed, and have more than complied with the same, on which bond was based, with the exception of the building of the fence."

While there are expressions in the last-mentioned letter which could reasonably be construed as the assertion of the right under the contract to clear and receive pay for all wooded lands flooded by the water of the lake, yet the fact that the appellant was insisting on his right to be relieved of the obligation of the bond, which bond certainly was intended by both parties to insure the completion of the entire contract, strongly tends to show that the appellant himself in making the contract understood that said contract contemplated the clearing of approximately the 1,250 acres. Appellant further testified that the reason and occasion for putting in the contract the recital that the land to be clearly consisted "of approximately 1,250 acres up to the flow line as staked out," etc., was that the bonding company objected to making the bond, unless some limitation on the land to be cleared was made and contained in the contract that said contract might contemplate the clearing of land up to Jacksboro (of which we are perhaps justified in taking judicial cognizance, is situated some 70 miles further upstream), and that he asked Mr. Trammell of the board of engineers how much land would be included, and Trammell told him that he thought approximately 1,250 acres, and it was so stated in the contract. Mr. Trammell testified

further in regard to these three letters mentioned:

"I recall having received letters from Mr. Hodge dated July 29, 1912, November 27, 1912, and December 30, 1912, and addressed to the board of engineers. At the time we received those letters Mr. Hodge had cut and downed very nearly all the timber below the nine-mile bridge. This estimate showing 599 acres was given a long time after the receipt of these letters there was approximately 600 acres that had been cut down, but the timber had not been cut up or removed; the balance of the land had been very well cleared. As to the land within the area of the 600 acres just referred to, they had just gone in there and taken axes and cut the trees down and just let them lay there; that is all there was to that. That is the condition that was existing there at the time Mr. Hodge was asking the release from his bond."

We have carefully examined the cases of Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622, Wolff v. Wells Fargo & Co., 115 Fed. 32, 52 C. C. A. 626, Inman Bros. v. Dudley, 146 Fed. 449, 76 C. C. A. 659, Marx v. American Malting Co., 169 Fed. 582, 95 C. C. A. 80, Loeb v. Winnsboro Cotton Co., 93 S. W. 515, and Lumber Co. v. Ogilvie, 113 Wis. 482, 89 N. W. 483, cited by appellant in support of his contention that the recital in the contract of the approximate acreage to be cleared would not be of controlling effect when, in connection with said estimate or approximation of the acreage, the contract recited that the party of the second part (Hodge) agreed "to clear the West Fork reservoir site." Such a construction as claimed by appellant would be justified if the facts aliunde the contract disclosed that the inclusion of the larger term, i. e., "the West Fork reservoir site," was not intended to be limited by the expression "consisting of approximately 1,250 acres," etc. But since the testimony of the city's agent, the chairman of the board of engineers, and the letters of appellant himself aforementioned, very strongly support the trial court's conclusion that the latter expression was intended to control rather than the former, we are of the opinion that the judgment below should not be disturbed. In addition to the fact that at the time the contract was made no lines had been staked out above the nine-mile bridge, and the map of the reservoir site contained no area of lines above said bridge, and since the evidence sustains the conclusion of the court that this map was shown the appellant before the contract was made, it may reasonably be concluded that the parties made the contract in view of the estimate made by the engineer as to the probable acreage of the submerged lands, and that, in any event, neither party understood that the contract contemplated the clearing of lands above the bridge. In fact there is some evidence to show that the engineers did not anticipate that lands above the bridge would be submerged, and outside of the fact that one tract of land north of the bridge, the Duringer tract, had been purchased by the city

before the making of the contract in question, there is no evidence to which we have had our attention called that the city was making any effort or provision for the purchase or condemnation of lands lying north of the bridge. It is true that the appellant denied that he ever was shown or saw the map mentioned, but this is a conflict of testimony which the trial court had the right to determine.

All things considered, we are of the opinion that we would not be justified in disturbing the judgment as rendered by the trial court. All assignments of error are overruled, and the judgment affirmed.