## 8829. DAWSON COTTON OIL COMPANY *v.* KENAN, McKAY & SPEIR.

1. The suit as amended remained an action ex contractu, notwithstanding the addition of allegations relating to the manner in which the contract which was its basis was breached, and characterizing the breach as wrongful or in bad faith.

2. Notwithstanding the estimate which the contract contained as to the probable output of cotton linters to be produced by the defendant during a particular season, the contract by its terms covered the *entire* output of such linters by the mill for that season, when operated at normal capacity and in good faith, and the delivery of the estimated number of bales by the defendant would not serve to discharge the defendant from liability on account of its unexplained failure to operate the mill and produce the usual and normal output for the period covered by the contract.

3. The petition as amended set out a cause of action, and the court did not err in overruling the demurrers.

DECIDED JANUARY 29, 1918.

Action for breach of contract; from city court of Dawson—Judge Edwards. April 17, 1917.

*Yeomans & Wilkinson,* for plaintiff in error.

*Payne & Jones, W. H. Gurr,* contra.

WADE, C. J. This was an action of complaint by Kenan, McKay & Speir against the Dawson Oil Company, growing out of the following contract:

"No. 7002. Atlanta, Ga., July 12, 1915.

Dawson Cotton Oil Company,

, Dawson, Georgia.

I have this day sold for your account to Messrs. Kenan, McKay & Speir, Atlanta, Georgia:

Quantity: Season's output—approximately five hundred (500) bales linters.

Quality: Cotton linters, clean mill run.

Price: Four and 00/100 cents (4c) per pound net sellers, f. o. b. cars Dawson, Georgia.

Shipment: As produced, beginning August, 1915.

Terms: Sight draft with B/L attached.

Rules: Cottonseed Crushers Association rules to govern. Arbitration, if any, at Atlanta, Georgia, buyers paying brokerage.

Accepted: Dawson Cotton Oil Company.

G. G. Riley, Manager.

M. O. King, Broker."

The petition shows: that on July 12, 1915, the plaintiffs entered into the foregoing contract, and by virtue thereof they purchased from the defendant its season's output, approximately 500 bales of clean mill run linters, at the purchase-price of four cents per pound, to be shipped as produced, commencing August, 1915; that the contract sued on was made subject to the rules of the Cottonseed Crushers Association of Georgia, rule 15, section 3 thereof, which was as follows: "When a sale is made of season's or balance of season's output of linters, the seller must ship and the buyer must receive all the linters the seller makes to the end of the season. When estimated number of bales is stated in contract or in confirmation of sale or purchase, the buyer must ship, or may ship, whether demanded or not, 15% in excess of estimated quantity, if he makes a sufficient number of bales to enable him to do so, and buyer must receive and pay for same at contract price. Should seller not make the quantity estimated, he shall deliver the number of bales made, and shipment of 85% of the estimated quantity shall be deemed a fulfillment of the contract. The limitation of each season to be the 31st of July, so that the season's output of linters shall include everything made up to July 31st." Plaintiffs also set out in their petition section 5 of said rule 15, as fol-

44

lows: "Weights and packages. A bale of linters for contract pur-
poses is 500 pounds gross weight, with a maximum or minimum
allowance of 5 per cent. No claim shall be made unless loss in
weight exceeds one per cent. Bales weighing less than 350 pounds
may be rejected by buyer." Petitioners further allege that under
said contract, and by virtue of the rules of the Cotton Association
of Georgia (which are made a part of said contract), and more
especially by virtue of the two sections (3 and 5) of rule 15, quoted
above, defendant became obligated to deliver to them in carload
lots "during the season 1915-1916, beginning August, 1915, as
said linters were produced, 425 bales of the gross weight of 475
pounds per bale, of clean mill-run linters, at the contract price of
4 cents per pound;" but that the defendant delivered only 186
bales of linters under said contract, leaving a balance of 239 bales,
of the gross weight of 475 pounds per bale yet to be delivered under
the contract. It is alleged that the breach of the contract was
occasioned as follows: that on or about April 29, 1916, defendant
refused to make any more linters, and declined absolutely to de-
liver the remaining bales due under the contract; that the plain-
tiffs have made demand on the defendant for delivery of the bal-
ance of bales due under the contract, and that defendant has failed
and refused to deliver the same; that in order to secure the number
of bales of linters due by the terms of the contract, the plaintiffs
were compelled to purchase in the open market on April 29, 1916,
239 bales at 7¾ cents per pound, thereby causing a resulting loss
of $4,256.59 to the plaintiffs, through the failure of the defendant
to perform its contract.

The plaintiffs amended their petition in several respects, but
the only amendments which we deem necessary for the decision of
the case are as follows: "Defendant became obligated to deliver
the *output* of its mill for the season 1915-1916, approximately 500
bales, amounting to at least 425 bales," etc. "Had defendant's
mill been operated in *good faith* during said season of 1915-1916,
as it was the duty of the defendant, under the said contract, to
have done, instead of discontinuing the operation of said mill dur-
ing said season, and before the expiration thereof, as defendant
*wrongfully did,* as will be hereinafter more fully shown, defendant
could and would and should have produced, as the season's output
thereof, and delivered to petitioner, as defendant should have done,

had it not breached its contract, as aforesaid, at least 425 bales, of the gross weight of 475 pounds each of clean mill-run linters, of the contract price of 4 cents per pound."

The defendant demurred both generally and specially to the petition as finally amended, the demurrers were overruled, and the defendant excepted.

According to the brief of counsel for the plaintiff in error, the sole question in the case "ultimately resolves itself into the construction of a contract, a determination of the character of the action, whether ex contractu or ex delicto."

1. The contention of the plaintiff in error is that the petition as amended should have been dismissed upon demurrer, for the reason that the amendment added a new cause of action, in that it was thereby attempting to supplement an ex contractu action by the addition of an ex delicto count; or that the suit as finally amended is duplicitous, being both ex contractu and ex delicto. The ground upon which this contention rests is that the plaintiffs effectually converted an ex contractu action into an action ex delicto when, by amendment, they alleged that the "defendant wrongfully and in bad faith refused to make any more linters, shutting down its mill," etc. By reference to the petition, which is substantially set out in the foregoing statement of facts, it is obvious that the action is expressly bottomed upon a breach of contract, and the mere fact that the plaintiff by way of amendment characterized the *manner* in which the defendant breached said contract as "wrongful," or "in bad faith," would not be sufficient to change the form of the action. This is not an action in tort, but an action to recover damages for a breach of contract. The action was not maintainable without pleading and proving the contract, and where it is manifest from a proper construction of the contract that the gist or pith of the action is the breach thereof, either by misfeasance or nonfeasance, it is in substance, regardless of what may be the form of the pleadings, an action ex contractu. See City of Grand Forks v. Steel, 121 Minn. 296 (141 N. W. 181, 45 L. R. A. (N. S.) 205, Ann. Cas. 1914C, 720); Whitaker v. Collins, 34 Minn. 299 (25 N. W. 632, 57 Am. R. 55).

Waiving, for the sake of the argument, what is said above, and proceeding upon the idea, as contended by plaintiff in error, that in view of the unequivocal allegations contained in the petition,

setting up a contract as the basis, and the breach thereof as the gravamen of the action, the petition became ambiguous (as to whether it was proceeding ex delicto or ex contractu) by reason of the amendment denominating the defendant's breach of duty as "wrongful" or "in bad faith," it should nevertheless be construed as proceeding ex contractu (rather than ex delicto), if under that form the suit could be upheld and a recovery had thereunder. See *Benjamin-Ozburn Co.* v. *Morrow Transfer &c. Co.,* 13 *Ga. App.* 636 (79 S. E. 753) ; *Wright* v. *Southern Ry. Co.,* 7 *Ga. App.* 545 (67 S. E. 272) ; *Payton* v. *Gulf Line Ry. Co.,* 4 *Ga. App.* 762 (62 S. E. 469) ; *Southern Express Co.* v. *Pope,* 5 *Ga. App.* 689 (63 S. E. 809). It is true that when the allegations of a petition are ambiguous as to whether the suit arises ex delicto or ex contractu, courts usually favor a construction making the action one ex delicto. The reason for this is readily seen, as generally such a construction is more favorable to the plaintiff, and a recovery thereunder can be more easily had, as the measure of damages in tort actions is usually broader than in actions upon contracts. This rule of construction is not in conflict with the well-settled practice, that as to allegations of fact in pleadings, the courts construe them, when they are ambiguous or equivocal, most strongly against the pleader. The true rule is aptly stated in the case of *Southern Express Co.* v. *Pope,* supra, as follows: "Where, however, a petition is filed and the facts alleged are such as would be proper or adequate under either of two forms of action, the courts, in endeavoring to ascertain the plaintiff's intention, will prima facie presume that he intended to serve his best interest and to declare in that form of action which would allow him the highest recovery permissible under that state of facts; or if to construe the pleadings as setting forth the transaction under one form of action would make it such that it might be upheld in the court in which it was filed, when otherwise it would not be, or would authorize a recovery when otherwise it would not, the courts will adopt the construction which will uphold the action and not defeat it." See also, in this connection, *Jenkins* v. *S. A. L. Ry.,* 3 *Ga. App.* 381 (59 S. E. 1120).

In view of the foregoing, we hold that the lower court did not err in treating the action as one arising ex contractu, and over-

ruling the demurrer seeking to dismiss the petition on the ground that it set out an action ex delicto.

2. Another contention insisted upon by the plaintiff in error is that even if the court should decide that the petition presents a cause of action ex contractu, it was nevertheless subject to demurrer for the reason that under the terms of the contract sued upon, the defendant was only required to deliver to the plaintiffs its *actual output,* regardless of whether the mill was operated in good faith, at its normal capacity, during the season named in the contract. This question finally resolves itself into a determination of whether the allegation in the plaintiff's petition that the mill was closed down *in bad faith before the expiration of the season named in the contract* saved the petition from dismissal on demurrer, since it was clearly alleged that the defendant actually delivered the entire output of its mill up to the time it discontinued operation. Of course, had the defendant discontinued the operation of its mill for some providential cause, or for any cause or causes not in anywise attributable to it, a delivery on the part of the mill of its output up to the time it ceased to operate would be all that the law would require. However, the contention that the defendant is not liable under its contract merely because it delivered its entire output up to the time it closed down is without merit, since the petition distinctly and specifically alleges that the mill was discontinued "wrongfully" and "in bad faith" before the season named in the contract had expired, and therefore with the deliberate purpose of breaking the contract. In the case of Loeb v. Winnsboro Cotton Oil Co. (Tex. Civ. App.), 93 S. W. 515, where a contract for the sale of cotton linters stipulated that the seller confirmed the sale to the buyer of the "season's output of linters . . . estimated at 200 to 250" bales (a contract very similar to the one under review), it was held that "the contract was for the sale of the *output* [italics ours], regardless of the number of bales, especially in view of the evidence that the buyer was buying linters generally, and wanted all he could get, and the *buyer was required to take the output, consisting of 66 bales in excess of the maximum estimate*" (italics ours). It will be observed that the question determined in that case was whether the contract bound the buyer to take the *full amount of the season's output,* or whether he was only bound to take 250 bales, the maxi-

mum estimate; it being held that "the season's output" was the subject-matter of the contract, and therefore that the estimate of 200 or 250 bales would not suffice to render the buyer only liable for the maximum estimate of 250. The rule applicable to cases of this character is well stated by Justice Bradley in Brawley *v.* United States, 96 U. S. 171 (24 L. ed. 622), as follows: "Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the quantity is named with the qualification of 'about' or 'more or less,' or words of like import, the contract applied to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, *in reference to which good faith is all that is required of the party making it*" (italics ours). It was said in the case of Inman *v.* Dudley, 146 Fed. 449 (76 C. C. A. 659), "This was an agreement to sell and deliver the entire cut of 1903, whatever it should be. . . Good faith was all that was required from the parties in making the estimate, or in the future operation of the mill." See also, in this connection, Rib River Lumber Co. *v.* Ogilive, 113 Wis. 482 (89 N. W. 483). In Marx *v.* American Malting Co., 169 Fed. 582 (95 C. C. A. 80), it was held, that "contracts for the supply of the material to be used in a certain business for a certain time limited, or for the purchase of the entire output of a certain plant or manufactory, for a certain time or season, are valid; this specification of the quantity contemplated by the parties is held to be sufficiently certain; that the certainty can be ascertained from the means to be supplied by the future exercise of the business *in good faith and in the normal manner of such business*" (italics ours). In Kellog *v.* Norman, 74 N. Y. 596, the court, in ruling upon an action brought to recover damages for the non-performance of a contract for the sale and purchase of a quantity of oil cake, rendered the following memorandum decision: "The material portions of the contract are as follows: 'Said first parties [plaintiffs] contract to sell to said second party [defendant] about 2,000 tons of good merchantable oil cake, of their manufacture, from domestic seed, packed in good well-sewed gunny bags, and to deliver the same in

good shipping order, free, alongside ships in New York, as follows: About 350 tons per month, from September, 1875, to February, 1876, both inclusive, . . . being all the oil cake made by said parties at their mill at Amsterdam, from domestic seed, during the period named, excepting that said parties may, at their option, reserve for their local meal trade a quantity not exceeding fifty tons per month.' Defendant received and paid for, at the contract price, nearly 2,053 tons. Plaintiffs did not avail themselves of the limits of their option to retain fifty tons per month; they shipped to defendant about 135½ tons manufactured in February, which defendant refused to receive under the contract. Plaintiffs thereupon, upon notice, sold the same, and claimed to recover the difference between the contract price and the market price. *Held,* that under the contract defendant was bound to take and pay for all the oil cake made by plaintiffs for the time agreed upon, in the absence of proof that the power of their mill was unduly urged."

From these decisions, and many others to the same effect, it is clear that the "output" of the defendant's mill for the season named in the contract, regardless of the estimated number of bales to be delivered, was the subject-matter of the contract, and that the buyer was bound to take the "output" of the mill *during the specified season.* This being true, certainly the seller was equally bound to operate his mill in good faith for *the season or time specified in the contract,* at its normal capacity, in order to make and deliver its "output" to the buyer. Otherwise we would have a unilateral contract, binding on one of the parties and without obligatory force on the other; that is to say, the Dawson Oil Company (the seller) would not be bound to operate its mill, and deliver to the plaintiffs the *output* of cotton linters *for the period therein specified,* whereas Kenan, McKay & Speir (the buyers) would nevertheless be obliged to accept the output of the mill *for the season,* even though in excess of the maximum estimate, if the seller so desired and elected to operate the mill for the full period. In the construction of a contract under which one of the parties is by law bound, the principle of mutuality, which is an essential element of every contract, compels a ruling that the other party shall also be bound by the terms of the contract, in order to make it a binding agreement. In the case of *McCaw Manufacturing Co.*

v. *Felder,* 115 *Ga.* 408 (41 S. E. 664), it was held that an offer
to supply a manufacturer with all of the boxes of a described
character "which should be rendered necessary to pack the output
of the factory" of the promisee during a specified time, and an
acceptance by the latter of such offer, constituted a contract which
*bound the promisor to furnish and the promisee to order,* during
the time specified, all the boxes necessary to pack the products
manufactured by the latter's company. This ruling has been ap-
proved in *Swindell* v. *First National Bank,* 121 *Ga.* 714 (49 S. E.
673) ; *Floyd* v. *Kicklighter,* 139 *Ga.* 133, 143 (76 S. E. 1011).

It is therefore apparent to us, from the allegations of the plain-
tiffs that the subject-matter of the contract sued upon was the
"output" of cotton linters for a *specified time or season,* and an
unexplained failure on the part of the defendant company to oper-
ate its mill until the expiration of the season amounted to a breach
of the contract, notwithstanding it actually delivered the "output"
up to the time it ceased operation; and consequently the lower
court properly overruled the demurrer insisting upon a different
construction of the contract and of the allegations of the petition.
A cause of action was set forth, and the court did not err in over-
ruling the demurrer upon all of the grounds thereof.

*Judgment affirmed. Jenkins and Luke, JJ., concur.*