# CHARLESTON.

FAYETTE-KANAWHA COAL COMPANY *v.* LAKE & EXPORT COAL CORPORATION.

Submitted April 26, 1922. Decided May 9, 1922.

1. CONTRACTS—*Coal Mine Operator's Agreement to Sell Output During Specified Period, Not Void for Want of Mutuality or for Uncertainty.*

    A contract by which the owner of a going coal mine agrees to sell to a dealer in coal, and such dealer agrees to purchase, the output of such mine for a definite time, is not void for want of mutuality or for uncertainty. (p. 138).

2. SAME—*Sale of Output of Mine During Specified Period Constitutes a Sale of the Output of Mine Operated in Good Faith in the Usual Way.*

    In such case the subject-matter of the contract of sale is

the output of such mine operated in good faith in the usual and ordinary way, and the owner thereof is under obligation to so operate the same during the life of the contract, and the purchaser is under obligation to take and pay for the output produced by such operation.    (p. 138).

3.    SAME—*Coal Mine Owner Who Has Sold Entire Output During Specified Period May Not Treat Contract as Abrogated Because Buyer is Unable to Take Some Coal Offered on Sudden Decline of Market.*

The owner of a coal mine who has sold the output thereof under an executory contract is not justified in treating the contract as abrogated because the purchaser is unable to take some of the coal offered at a time when the market has sudenly declined sharply, and enters into negotiations for a modification of the contract, but does not repudiate the same or deny his obligation thereunder, and is making efforts to dispose of the coal offered to the best advantage so as to minimize his loss as far as possible.    (p. 140).

4.    SAME—*Renunciation by One Party to Excuse Performance by the Other Must be Unequivocal and Deal With Performance of Entire Obligation.*

Renunciation by one party to a contract which will excuse performance by the other must be unequivocal and absolute, and deal with the performance of the entire obligation to which the contract binds the parties.    (p. 140).

5.    SAME—*Measure of Damages on Refusal of Buyer of Entire Output of Mine During Specified Period to Accept Coal Stated.*

Where the owner of a mine sells the output thereof for a definite time at a specified price, and the purchaser declines to accept the coal mined, and the owner sells the same on the market at the market price, he is entitled to recover as damages on account of the coal so mined and refused by the buyer the difference between the contract price and the market price.    (p. 142).

6.    SAME—*On Buyers' Repudiation of Contract to Purchase Output of Mine, Seller Being Required to Close Mine for Shortage of Cars Could Recover Difference Between Contract Price and Amount he was Not Required to Expend for Production Because Mine was Closed.*

Where the owner of a mine contracts to sell the output thereof for a certain period at a certain price, and the buyer, before the expiration of the contract, repudiates the

same, and refuses to take any more of the coal thereunder, and the owner of the mine cannot operate the same for the reason that his supply of railroad cars depends upon their being moved promptly after being loaded, and the market price of the coal has fallen to a point below the amount which the owner was not required to expend for operation because the mine was not running, he is justified in closing the mine, and in a suit against the buyer is entitled to recover as damages the difference between the contract price and the amount which he was not required to expend for production by reason of such mine not being operated. (p. 143).

7. SAME—*Where Seller Installed Additional Equipment After Securing Contract for Sale of Entire Output for Specified Period, His Damages on Buyer's Repudiation of Contract is Based on Amount Mine Would Have Produced in Condition in Which it Was When Contract Was Made.*

Where in such case the owner of a mine, after the contract is entered into, has greatly increased his facilities for producing coal by the purchase and installation of new and additional machinery and equipment, he is not entitled to the measure of damages above indicated based upon the amount of coal which the mine would produce in its changed condition, but his recovery will be limited by applying such measure of damages to such amount of coal as the mine would have produced in the condition in which it was at the time the contract was made, operated in good faith in the usual and ordinary way. (p. 143).

Error to Circuit Court, Kanawha County.

Suit by the Fayette-Kanawha Coal Company against the Lake & Export Coal Corporation. Judgment for plaintiff, and defendant brings error.

*Reversed and remanded.*

*Marcum & Marcum, Byrne, Littlepage & Linn,* and *Holt, Duncan & Holt,* for plaintiff in error.

*Price, Smith, Spilman & Clay,* for defendant in error.

RITZ, JUDGE:

This suit was instituted for the purpose of recovering damages for the alleged breach of an executory contract providing for the sale of the output of the plaintiff's mines to the de-

fendant for the period of one year, the plaintiff's contention being that before the expiration of the said one year defendant failed and refused to take its coal, by reason whereof it is entitled to recover damages accruing to it, on account of such failure. Plaintiff had a judgment in the court below, to review which this writ of error is prosecuted.

The plaintiff owned and operated two coal mines situate between Handley and Montgomery, one known as Mine No. 1 of the Winifrede Seam, and the other as Mine No. 2 Gas Seam, and the defendant was engaged in the business of buying and selling coal. On the 26th of June, 1920, these parties entered into a written contract, by which the plaintiff agreed to sell and the defendant agreed to buy the output of these two mines for a period of one year from the 26th of June, 1920. It was provided in this contract that in the event railroad cars could not be obtained for the shipment of all the plaintiff's output it might sell the excess and ship it by river. Under this contract the plaintiff furnished no coal to the defendant from Mine No. 1 during the months of June and July, 1920, but delivered to it therefrom five cars during the month of August, 1920, and four cars during the month of September of that year. This mine was then shut down, and no more coal mined thereat during the life of the contract. It seems that the reason therefor was that labor was very scarce at the time and the plaintiff could by using all the labor obtainable mine practically the same amount of coal at its No. 2 mine that it could by dividing its forces. It appears that the defendant was informed of this fact, and apparently acquiesced therein. No. 2 mine was operated from June 26, 1920, to December 31st of that year, when it was likewise closed down, as contended by the plaintiff, because the defendant refused to take any more coal from it under the contract, and because it was unable to sell the same to other parties. Between June 26, 1920, and December 10th of that year plaintiff delivered to the defendant from Mine No. 2 7087.5 tons, and during the same period shipped by river 4026 tons. It appears that all the coal actually delivered to the defendant has been fully paid for in accordance with the

terms of the contract. Plaintiff loaded two cars with coal on the 13th of December, 1920, and asked the defendant for billing for the same. At that time there was a decided break in the coal market, and it was unable to furnish billing for the two cars. Plaintiff made repeated demands upon the defendant to move these two cars, but was unsuccessful in having them disposed of. Because of the fact that these two cars remained loaded on its tracks the railroad company would not furnish it any more empty cars for loading coal. It mined, however, in the month of December, in addition to the coal delivered to the defendant and the two cars aforesaid, 1256 tons of coal, which were shipped by river, and which would have been and could have been, according to plaintiff, loaded in railroad cars had it not been for the defendant's failure to furnish billing for the two cars loaded on December 13th. This coal was sold by river at a price considerably less than the price called for in the contract, and the loss on it constitutes one of the elements of damages in this case. The two cars loaded on December 13th were likewise finally sold by the plaintiff for considerably less than the price provided for in the contract, and this loss constitutes another element of the damages claimed. On December 31st plaintiff closed its mines, and did not again operate the same during the life of the contract. It appears that from that time until the expiration of the contract by its own terms the market price of coal at no time was as much as the cost of production. Another item of damages claimed by the plaintiff is the difference between the contract price and the cost of producing such coal as the plaintiff could have mined at its two mines had the defendant furnished shipping instructions promptly therefor; and still another item is the cost of maintenance and upkeep of the mines in caring for and preserving the property from the first of January, 1921, to the 26th of June, 1921, while said mines were closed down as aforesaid.

After the evidence was all in the court on motion of the plaintiff instructed the jury that as matter of law the defendant had violated its contract, and that the plaintiff was entitled to recover, and directed the jury that the measure of

the plaintiff's damages was the difference between the contract price and the price at which the coal mined in December, and not accepted by the defendant, was actually sold by the plaintiff, or the market price thereof, it appearing that it was sold at the market price, and that the plaintiff was entitled to recover on account of such breach of the contract on the part of the defendant the difference between the contract price and the fair and reasonable cost of production of all coal which could have been reasonably produced by the plaintiff during the period from January 1st to June 26, 1921, and in addition the fair and reasonable cost of the maintenance and upkeep of the mines during said period. Under this instruction the jury returned a verdict in favor of the plaintiff for the sum of $64,227.41, upon which the judgment complained of was rendered.

The defendant insists that its demurrer to the plaintiff's declaration should have been sustained, for the reason that the contract set up therein is void for lack of mutuality, or for indefiniteness as to the subject-matter, or for both of these reasons; that the court erred in giving the peremptory instruction to the jury directing a finding in favor of the plaintiff, for the reason that there had never been any repudiation of the contract upon the part of the defendant, or any refusal upon its part to accept coal thereunder; that the measure of damages laid down by the court in the instruction given to the jury is incorrect, in that it allowed a recovery for the difference between the cost of production and the contract price for all such coal as might reasonably have been produced by the plaintiff at its mines between the first day of January and the 26th day of June, 1921, when it appears that by additions and improvements to the mines the production thereof had been very substantially increased as compared with what it might reasonably be expected to be at the date of the making of the contract; and that it also directed the jury to allow as damages the cost of maintenance and upkeep of the mines during this idle period, it being contended by the defendant that it was in no event liable for this item, inasmuch as it would have had to be borne by the plaintiff

whether the mines were running or not. There are also some errors relied upon in the admission and rejection of evidence, which will be noticed in passing.

The defendant earnestly contends that its demurrer to the declaration should have been sustained for the reason that the contract therein pleaded is void for want of mutuality, or for indefiniteness as to its subject-matter, or for both of these reasons. The contract provides for the purchase by the defendant of the output of the plaintiff's mine, and for the sale of this output to the defendant by the plaintiff. There is no definite number of tons specified, nor is there even an estimate as to the number of tons expected to be shipped under the contract. The defendant's contention is that this contract by its terms did not impose upon the plaintiff any duty to operate the mines; that the only obligation imposed upon it was to sell such coal as it produced at the mines to the defendant; that if at any time the contract became burdensome to it it could escape the obligation of the same by simply closing down its mines, and not producing any coal; that this made the promise upon the part of the plaintiff illusory and uncertain, and its obligation to depend entirely upon its own desires or wishes, as the same might be dictated by conditions arising during the life of the contract, and not upon the terms of the agreement. Is this the true construction of the contract? It must be borne in mind that when the parties entered into this contract they intended to accomplish some purpose by it, and this court will not give to it a construction which will render it void if it can reasonably be interpreted so as to give it effect. There is no uncertainty in the contract, except as to the subject-matter thereof, nor does it appear to us that there is very great uncertainty in this regard. The plaintiff had two small mines from which it was producing coal, and the subject-matter of the contract was the output of these mines. The reasonable capacity of the mines at the time the contract was entered into was apparent to anyone reasonably familiar with the coal business, and the defendant, when it purchased the output of these mines, could, and no doubt did, inform itself as to the amount of coal it could reasonably expect to receive therefrom. Abso-

lute certainty is rarely attainable. All that is required is reasonable certainty. But the defendant insists that there is no obligation upon the plaintiff under the contract to operate the mines; that even though it may be considered that it would have to deliver to the defendant all of the coal that it mined, still it could easily avoid its obligation by simply closing down its plant. But is this true? The plaintiff sold and undertook to deliver to the defendant at a certain price the output of its mines. The parties contracted in relation to the conditions that existed at that time. Could the plaintiff as matter of law at any time cease operations and avoid liability? We do not think so. We think the plaintiff was under the same obligation to operate these mines in the ordinary way in good faith that the defendant was to take the coal produced under those circumstances. The contract clearly implies such operation upon the part of the plaintiff, and what is necessarily implied is as much a part of the contract as though it were expressed in it. There are some authorities relied upon by the defendant which hold that under a contract like this the seller is under no obligation to operate the mill or mine, and may terminate the contract at any itme by simply closing it down. Typical of this class of cases is *Jones* v. *Lanier*, 198 Ala. 363, 73 So. 535, in which it was held that the owner of a mine under a contract very similar to this was under no obligation to operate it, and because of this fact the contract lacked mutuality, and was unenforceable. We think, however, that those authorities which hold that the owner of a mine or mill under such circumstances is under an implied obligation to operate are sustained by the better reason, typical of which cases is that of *Wells* v. *Alexander*, 130 N. Y. 642, 15 L. R. A. 218, wherein it was held that a contract by which the owner of certain vessels agreed to buy the coal needed for the operation of his vessels at a certain price could not avoid the effect of his contract by selling the vessels; and the case of *Dawson Cotton Oil Co.* v. *Kenan, McKay & Speir*, 21 Ga. App. 688, 94 S. E. 1037, wherein it was held that one who contracted to sell the product of his mill to another for a certain time is under an implied obligation to keep the mill in operation during that time in the

¬usual and ordinary way in good faith. This conclusion is
fully supported by the authorities. 1 Williston on Contracts,
§ 104, pages 217-218; 1 Page on Contracts, § 850, page 983; 6
R. C. L., title "Contracts" § 95; 23 R. C. L., title "Sales" §
:85; 35 Cyc. 208; *Minnesota Lumber Co.* v. *Whitebreast Coal
Co.*, 160 Ill. 85, 31 L. R. A. 529; *Lima Locomotive & Machine
Co.* v. *National Steel Castings Co.*, 155 Fed. 77, 11 L. R. A.
(N S.) 713 and note; *T. W. Jenkins & Co.* v. *Anaheim Sugar
Co.*, 247 Fed. 958; L. R. A. 1918 E. 293; *Thomas-Huycke-
Martin Co.* v. *Gray*, 94 Ark. 9, 125 S. W. 659, 140 Am. St.
Rep. 93; *Burgess Sulphite Fibre Co.* v. *Broomfield*, 180 Mass.
283; *E. I. Du Pont De Nemours Powder Co.* v. *Schlottman*, 218
Fed. 353; *Ellis* v. *Dodge Bros.*, 246 Fed. 764; *Pittsburgh Plate
Glass Co.* v. *H. Neuer Glass Co.*, 253 Fed. 161; *Transcon-
tinental Petroleum Co.* v. *Interocean Oil Co.*, 262 Fed. 278;
*Robertson* v. *Garvan*, 270 Fed. 643. There is no more reason
¬why the owner of a mine who sells the output thereof should
be allowed to avoid his obligation by closing down the mine
than there is for holding that one who sells a commodity he
has on hand may avoid the effect of his contract by dis-
abling himself from performing it by making sale of the
commodity sold to a third person. We are of opinion that
the court below did not err in overruling the demurrer to the
declaration; that by the terms of the contract declared upon
the plaintiff was obliged to operate its mines during the term
provided in the contract in the usual and ordinary way in
good faith, and was required to deliver to the defendant the
coal produced by such operation, and the defendant obli-
gated itself to take the coal so produced and to pay for the
:same at the price agreed upon in the contract.

 The defendant insists that the trial court erred in instruct-
ing the jury that the plaintiff was entitled to recover. Its
contention is that under the evidence it was for the jury to
determine whether the defendant had repudiated the contract
and refused to further be bound thereby so as to justify the
plaintiff in closing down its mines, and relying upon its action
for damages for breach of the contract. The plaintiff's officers
and agents testify that they had several conferences with the
officers and agents of the defendant in regard to receiving

the coal; that the defendant's officers endeavored to secure a, modification of the contract, and that when their proposals in this regard were declined they flatly refused to be further bound by it, and declined to receive any more coal under it. The defendant's officers and agents testify that they did have these conferences with the plaintiff's officers, and that they did endeavor to secure a modification of the contract which would enable them to carry it out without sustaining such a heavy loss, but they say that they never at any time repudiated the contract, but at all times recognized their obligation to accept the coal under it; that they had their corps of salesmen and agents in the field attempting to make sale of the coal at the best price obtainable, so as to minimize their loss as much as possible, and their contention is that while they were unable during the latter part of December and the month of January to accept the coal as they agreed to do, they were getting themselves in position to do so, and would have disposed of it in the market if the plaintiff had not at one of their meetings renounced the contract and declared its purpose to bring a suit for damages thereon, which purpose it carried out by bringing such suit in the month of February, 1921. For the purpose of testing the propriety of the ruling of the circuit court on this instruction we must consider that the contention of the defendant is the true one, and can it be said as a matter of law that under the state of facts attempted to be set up by the defendant it had repudiated the contract so as to justify the plaintiff in closing down its mine and producing no more coal therefrom? It might very well be that the buyer under a contract like this would meet a situation which would temporarily render it impossible for him to comply with the terms of his contract, but that would not necessarily justify the other party in treating such inability as a, repudiation of the contract. The defendant here claims that while it was unable temporarily to take the coal as the same was produced by the plaintiff, it was making arrangements to handle it, and would have been able to handle it within a very short time so as to comply with its obligations, and render it liable to the plaintiff only for the damages sustained during such temporary suspension. It has been held frequently

that the renunciation of an executory contract by one party
thereto which would excuse performance by the other must
be unequivocal and deal with the entire performance to which
the contract binds the party which it is claimed has re-
nounced the same. *Bannister* v. *Coal & Coke Co.*, 63 W. Va.
502; *Bingley* v. *Oler,* 117 U. S. 490; *Lawrence* v. *Potter,*
decided at this term. We think it quite clear that if the defend-
ant was in good faith endeavoring to carry out its contract,
the fact that it had failed to take some of the coal offered to it,
because of the sudden break in the market, did not justify the
plaintiff in closing down its mines and producing no more
coal. If, on the other hand, the defendant's renunciation of
the contract was, as contended by the plaintiff's officers, an
unequivocal declaration upon its part that it would receive
no more coal under it, then, of course, the plaintiff was justi-
fied in treating the contract as broken in its entirety. The
evidence upon this question, however, is conflicting, and in-
stead of directing the jury to find in accordance with the
plaintiff's contention the court should have submitted that
question to the jury for its decision under proper instructions.
This conclusion, of course, would render proper the evidence
offered by the defendant tending to show the efforts it was
making to dispose of the coal, and meet its obligations to the
plaintiff, which was rejected by the court, and is the subject
of one of the assignments of error.

The defendant also criticises the rules laid down by the
court for the governance of the jury in ascertaining the
amount of damages to which the plaintiff is entitled. As to
the coal actually mined in the month of December, 1920, which
the defendant failed to receive in accordance with the terms
of its contract, compelling the plaintiff to dispose of the
same on the market at a price considerably less than the con-
tract price, there can be no doubt of the proper measure of
damages. This would be the difference between the contract
price and the market price of the coal at the time and place
at which the defendant should have received it, which is
shown to be the price at which it was sold, and this is the

measure of damages prescribed by the court's instruction as to this element of the plaintiff's case.

A more serious question, however, arises when we come to the proper measure for the damages claimed by the plaintiff for the loss sustained by it on account of its inability to operate its mines from the first of January to the 26th of June, 1921. The court instructed the jury that the plaintiff was entitled to recover on this account the difference between the cost of all coal which the plaintiff could reasonably have produced during that period and the contract price. It is insisted by the defendant that this measure of damages is not correct for the reason that it is shown by the evidence that after the contract was entered into the plaintiff largely increased the capacity of its mines, so that on the first of January, 1921, and from that time until the 26th of June of that year the jury were instructed to find damages upon a basis of production which the parties could not have contemplated at the time the contract was entered into. The proper rule for the determination of the damages on this account, if the jury should believe that the defendant had repudiated the contract, would not necessarily be the difference between the cost of production of the coal which the defendant was obligated to receive under the contract and the contract price. The true measure of damages in such case is the contract price less such amount as the plaintiff was not required to expend because the mine was not running. The plaintiff would not be entitled to take the market price as one of the elements to be considered, it being shown that this market price was less than the amount which the plaintiff saved on the production while the mine was idle. If the plaintiff had produced the coal and delivered it to the defendant, it would be entitled to receive, of course, the contract price, and it would have had as profit whatever this amounted to in excess of the cost of production. In this case, however, it did not produce the coal, and if this failure is properly attributable to the defendant, then the defendant must still pay the contract price, with credit thereon for whatever the plaintiff saved on account of the mine being closed down. In this case the plaintiff did not save the whole cost of production. There were some items of expense

which had to be borne notwithstanding the mine was not being operated, and of course the defendant could claim no credit for these items. The rule laid down by the court for the guidance of the jury in ascertaining the damages because of the refusal of the defendant to receive the coal when applied to the facts of this case is not accurate, and on a retrial should be modified as above indicated. But the most serious objection made to the rule laid down by the court is that it required the defendant to pay damages on a much larger amount of coal than was really contracted for. It appears from the evidence in this case that after the contract was entered into the plaintiff largely increased its output by the purchase and installation of additional equipment. Can it be said that this contract bound the defendant to receive all of the coal that the plaintiff could reasonably mine under any and all conditions? Could the plaintiff by the purchase and installation of this additional machinery and equipment change the subject-matter of the contract, and make it largely in excess of what it would have been under the conditions existing at the time it was entered into? It is true, one of the officers of the plaintiff states that at the time the contract was made it was understood that the plaintiff would increase its capacity by the installation of this additional equipment and machinery, but this condition cannot be added to the contract by parol evidence. If it is to be held that one party to the contract can increase or diminish the subject-matter thereof at its pleasure, then the contention that it is void for lack of mutuality or for uncertainty would, to say the least, be very tenable. We think the question here is, what did the parties contract in regard to? What was the subject-matter of their contract? And when we discover this we must use that as the measure of their reciprocal obligations. Neither one party nor the other may be allowed to vary this subject-matter in the absence of an agreement therefor. Let us apply the doctrine contended for here by the plaintiff to the kind of contracts of this character with which the courts have been most concerned, and that is, to contracts to purchase or sell the output of a factory. Could it be said that one who had agreed to buy the output of a factory, and who had during the life of the con-

tract repudiated it, and refused to be further bound thereby, could be made to pay damages to the plaintiff for the output of a factory whose capacity had been doubled by adding thereto additional units after the contract was entered into? Surely no one would contend for this.  How then can we apply a different rule in this case?  The parties contracted for the output of the plaintiff's mines as the same existed on the 26th of June, 1920.  The plaintiff's superintendent testifies that in the month of July following he and the general manager worked out a scheme for the installation of additional equipment and for increasing the output, and under the instructions of the court in this case the defendant was held to be under obligation to accept, not only the output it contracted for, but the additional output which could be produced by the use of these increased facilities.  We think the plaintiff's recovery of damages after the time the mine was closed down must be limited by applying the rule laid down above to such quantity of coal as could have been mined by the plaintiff at its mines as the same existed at the time the contract was entered into, being operated in good faith in the usual and ordinary way.

The court further instructed the jury that the plaintiff was entitled to recover, in addition to the items above referred to, the fair and reasonable cost of the maintenance and upkeep of its mines during the period from Jany. 1st to June 26, 1921, while the same were shut down.  There is no theory upon which any such recovery can be justified when the true measure of damages is applied as above indicated.

For the errors above pointed out, the judgment will be reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and remanded.*