# CHARLESTON.

FAYETTE-KANAWHA COAL COMPANY *v.* LAKE & EXPORT COAL CORPORATION.

(No. 4822)

Submitted October 20, 1925. Decided October 27, 1925.

SALES—*After Plaintiff Closed Mine and Defendant Acquiesced Therein, Considering Assumed Production in Action for Loss of Anticipated Profits Held Error.*

The plaintiff being the owner of two coal mining plants, designated as Mine No. 1 and Mine No. 2, on June 26, 1920, sold to defendant, a coal selling agency, the output therefrom, for the ensuing year. Plaintiff operated Mine No. 2 from the date of the contract to December 31, 1920, delivering to defendant coal therefrom until December 13, 1920, when the defendant failed to accept any more coal. Mine No. 1, which was closed at the time of the contract, resumed operations about the first of August, 1920, and after producing in that month and in September nine cars of coal, under the contract, again ceased operation on the 15th of September. Thereafter, on September 25, 1920, the plaintiff in writing

advised defendant of the closing of this mine for the reason
that it did not have sufficient houses for its miners and could
not begin construction of the needed houses until after the
end of the contract period.   This was acquiesced in by the
defendant and Mine No. 1 remained closed thereafter during
the contract period.   In an action for damages by plaintiff
against defendant for alleged breach of the contract to accept
coal thereunder after December 13, 1920, for the loss of
anticipated profits, it is improper to consider the assumed
production of Mine No. 1.

(Sales, 35 Cyc. p. 126.)

(Note:   Parenthetical references by Editors, C. J.—Cyc.   Not
part of syllabi.)

Litz, Judge:

By an action in assumpsit the plaintiff recovered judgment
upon the jury's verdict in its favor against defendant in the
sum of $50,281.10 for loss of anticipated profits on account
of alleged breach by defendant of an executory contract for
the sale and purchase of coal.   Defendant brings the case
here for the second time, judgment for plaintiff upon the
first trial having been reversed upon a former writ of error.
*Fayette-Kanawha Coal Company* v. *Lake & Export Coal Corporation*, 91 W. Va. 132.

The plaintiff being the owner of two coal mining plants in
Fayette county, designated Mine No. 1 and Mine No. 2, on
June 26th, 1920, sold to defendant, a coal selling agency,
their entire output for the ensuing year at $5.50 per ton f. o. b.
cars mines.   The price fixed was subject to increase or de-
crease as cost of producing coal might rise or fall; and soon
after the contract was made $.60 per ton was added on ac-
count of an increase in wages to laborers.   The contract per-
mitted the plaintiff in event railroad cars could not be ob-
tained for delivery to defendant of all its output, to sell the
excess to others, using river transportation.

No coal was furnished or tendered by the plaintiff under
the contract from Mine No. 1 except five cars in August and
four cars in September, 1920.   This mine was then shut down
and produced no more coal during the period of the contract.
On September 25th, 1920, the plaintiff by letter advised de-
fendant:

"In reporting the increased cost at Fayette-Kanawha Coal Company Mines, we will explain the situation.

"When we took over this property, the gas coal seam was being operated. We at once started to clean up the hard coal and started to run coal from the hard coal mine about two months ago. Although we did not have houses enough to justify the opening of this seam, we were lead to believe that on account of its being located close to Montgomery, we would get quite a number of miners living in outside houses. This, however, did not prove out as we had supposed, and about a week ago we decided that we were putting ourselves to unjustified expense in keeping the two mines in operation. We were getting out a little more coal from the two mines than we did from just the gas coal mine, but not enough to justify the extra day force. *We are building houses as rapidly as possible, but will be able to take care of all men we can house in the gas coal seam for the next ten months. After that, we anticipate building houses for the hard coal seam.*

"In view of the above facts, we have eliminated the coal produced in the hard coal seam (Mine No. 1); also the day and monthly men connected with this mine from our calculations. To have included them, would have run our extra cost very much higher.

"We ran from August 16, to September 15, 1769 tons. The extra cost on account of the recent raise, not including the hard coal seam, from August 15, to September 16, was $1022.85. This makes an increase cost per ton of 58c. We have not figured supplies or mining timber in this. I believe therefore, the 60c would be about a fair figure for our increased cost at this time."

No. 2 mine was operated from the date of the contract to December 31st, producing 7087.5 tons, delivered to defendant, and 4488.5 tons, shipped by river to E. J. Hickey Transportation Company.

This action is founded upon the claim that defendant violated the contract by refusing to accept coal after December

10th, 1920; and plaintiff's bill of particulars states the items of damage as follows:

> "1256 tons of coal mined between December 11, 1920, and December 31, 1920, at $6.10 per ton...............................$ 7,611.60
>
> "This charge was credited by the 1,131 tons shipped by river during that period to the Hickey Transportation Company, and sold to it at $3.25 per ton, making $3,675.75, and likewise by the two cars that the defendant was unabled to furnish billing for on the 13th day of December, 1920, containing 125 tons, which were subsequently sold by the plaintiff at $1.85 a ton, or $231.25, making a total credit of.............................$   3,907.00
> and leaving a balance on the first item charged in the bill of particulars of......$   3,754.60
>
> "The second item of the bill of particulars was:
>
> 36,487 tons of coal that would have been produced from both mines between January 1, 1921, and June 26, 1921, at $6.10 a ton ($222,570.70) less amount saved on account of mines being closed down during said period (amounting to $3.03 a ton or $110,580.19) .................................................$111,990.51
> "Both items totaling..............................$115,745.11."

The defendant accepted and paid for, under the contract, all coal loaded on cars prior to December 13th, 1920. On that date plaintiff loaded two cars containing 125 tons, and immediately requested of defendant shipping instructions therefor. It was necessary that these cars be removed from the siding under proper billing before the railroad would supply empties for further shipments. The coal market having suddenly declined, the defendant was unable to secure orders for plaintiff's coal, and these cars remained on the siding. In the meantime plaintiff continued to operate its No. 2 mine until December 31, 1920, delivering the output

therefrom on barges to the E. J. Hickey Transportation Company; but did not mine any coal after that date during the life of the contract, the cost of production being in excess of the market price. Negotiations between representatives of plaintiff and defendant, looking to a modification of the contract, followed the shutting down of Mine No. 2; and on January 21, 1921, a concrete proposal for this purpose was made by defendant. This offer, however, was promptly rejected by plaintiff and suit immediately resulted.

Whether or not the plaintiff was justified in treating the conduct of defendant as constituting an anticipatory breach by the latter of the entire contract, entitling the former to immediate suit, we have held in the former decision to be a question for the jury. The record here does not warrant a different conclusion. It was there said:

> "We think it quite clear that if the defendant was in good faith endeavoring to carry out its contract, the fact that it had failed to take some of the coal offered to it, because of the sudden break in the market, did not justify the plaintiff in closing down its mines and producing no more coal. If, on the other hand, the defendant's renunciation of the contract was, as contended by the plaintiff's officers, an unequivocal declaration upon its part that it would receive no more coal under it, then, of course, the plaintiff was justified in treating the contract as broken in its entirety."

The defendant presents the following assignments of error:

(1) The testimony of plaintiff's witnesses Clark, Marmet, Oliver and Hemmings, was improperly admitted, for the reason that they were unacquainted with the equipment of plaintiff's mines at the date of the contract, and because their opinions, as experts, relate to a subsequent condition of the mines.

The mine equipment was greatly extended and improved after the date of the contract. It is claimed that this evidence violates the rule laid down in the former opinion that the damages, if any, should be calculated upon the amount of coal the mine would have produced in its condition at

the date of the contract, operated in good faith in the usual and ordinary way.

These witnesses were permitted to · estimate the assumed output of the mines from January 1st to June 26th, 1921, based upon the working places or face capacity, in October, 1921, and the equipment available at the date of the contract, detailed in the questions propounded for the purpose. The mines had not been operated between January 1st and October, 1921, and the increase in the number of working places between the former date and the execution of the contract had resulted from usual and ordinary operation.

We think that under these circumstances this evidence should not have been excluded on the grounds stated.

(2)  The court improperly instructed the jury to find for the plaintiff for the coal produced between the 13th and 31st of December, 1920, and sold to the E. J. Hickey Transportation Company, the difference between the contract price and the market price at the time and place of production.

This was a proper instruction, even under the theory of defendant that it was not guilty of a breach of the entire contract; there being no denial that the plaintiff was unable to deliver that coal to defendant on account of the latter's failure to furnish shipping instructions for the two cars loaded December 13th.

The modification of defendant's instruction No. 5 on this phase of the case was for the same reason proper.

(3)· The jury was also improperly instructed to find damages upon the amount of coal which *could* have been mined and loaded aboard railroad cars by the plaintiff from both mines between January 1st and June 26th, 1921, the mines as they existed at date of the contract being operated in good faith in the usual and ordinary way.

The first point of objection is that this instruction by the use of the word "could" permitted the jury to speculate on the possible output of the mines and fix damages upon that basis; or, in other words, the jury was thereby told that it could assess damages based upon the highest possible capacity of the mines operated in good faith in the usual and ordinary way. This, of course, would not be a proper basis. Point 7

of the syllabus of the former decision states that damages should be calculated on the amount of coal ''the mine would have produced'' in the condition in which it was at the time the contract was made, operated in good faith in the usual and ordinary way. We think the instruction should have followed that language.

(4)   This instruction is also objected to for including Mine No. 1 within the inquiry of damages. It is asserted that this mine had been eliminated from the contract by agreement, evidenced by the letter from plaintiff to defendant of September 25, 1920, and subsequent conduct of the parties.

The letter in plain effect advises that Mine No. 1 had been closed and would not be operated further during the contract period. This was agreed to, or acquiesced in, by the defendant. It may be, as plaintiff's counsel suggest, that the letter was written primarily for the purpose of noting increase in the cost of production. In doing so, however, it was necessary to determine whether Mine No. 1 would operate. Not only was the future operation of this mine excluded in determining the cost of production, but as further evidence of the purpose to eliminate it from the contract altogether, its past operation was also ignored in making up the cost basis. In this connection the letter states:

> ''In view of the above facts, we have eliminated the coal production in the hard coal seam (Mine No. 1); also the day and monthly men connected with this mine, from our calculations.''

The letter clearly shows that in contemplation of the contract this mine had been closed permanently. The increased cost of production, noted in the letter, was of less moment to the defendant than the fact, thereby conveyed, of Mine No. 1 having been permanently closed. To know whether or not this mine would be operated was of the highest importance to defendant in order that it might sell in advance the coal produced therefrom, and thus protect itself against a decline in the market which has proved so valuable to plaintiff at the expense of the defendant.

It is vigorously asserted for the plaintiff that this Court held on the former writ that the plaintiff was entitled to recover the profits it would have made by the operation of both mines, and that the question here presented by defendant is therefore *res judicata.* We do not so construe that decision, wherein it is said:

"Under the contract the plaintiff furnished no coal to the defendant from Mine No. 1 during the months of June and July, 1920, but delivered to it therefrom 5 cars during the month of August, 1920, and 4 cars during the month of September of that year. This mine was then shut down and no more coal mined thereat during the life of the contract. It seems that the reason therefor was that labor was very scarce at the time and plaintiff could, by using all the labor obtained, mine practically the same amount of coal at its No. 2 mine that it could by dividing its force. It appears that the defendant was informed of this fact and apparently acquiesced therein".

It is also contended that the defendant is estopped to rely upon this defense for the reason that an instruction was given at its instance directing the jury to find damages in favor of defendant as an offset to the claim of the plaintiff by reason of its failure to operate and deliver to the defendant coal from Mine No. 1 prior to the time it is alleged that the defendant breached the contract, "unless the jury should further find that the defendant had waived its right to demand fulfillment of the plaintiff of its contract in respect to Mine No. 1". After the court had given the instruction for the plaintiff, authorizing the jury in fixing the damages to take into consideration the potential output of both mines, the instruction in question which followed for the defendant did not necessarily commit it to the theory that both mines should be considered in fixing the damages. Defendant by this instruction was simply attempting to make the best of a bad situation.

The final argument is that although mine No. 1 be excluded from the case, the evidence for the plaintiff of the potential

output of Mine No. 2 is sufficient to support the verdict. This cannot be justified under the law. The admission of illegal testimony presumptively prejudices the party against whom it is admitted and is cause for reversal unless it is apparent the verdict could not have been influenced thereby. As the estimated production of Mine No. 1, according to the evidence for the plaintiff, was even more than that of Mine No. 2, we certainly can not say that the jury would have found the same verdict on the evidence of the capacity of Mine No. 2 alone.

The judgment of the circuit court will be reversed, the verdict of the jury set aside, and a new trial awarded defendant.

*Reversed and remanded.*