**STANDARD MAGNESIUM CORPO-
RATION, a Kansas corpora-
tion, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 5491.**

United States Court of Appeals
Tenth Circuit.

Feb. 7, 1957.

Harry M. Crowe, Jr., Tulsa, Okl., for appellant.

Charles H. Froeb, Asst. U. S. Atty., Tulsa, Okl. (B. Hayden Crawford, U. S. Atty., Tulsa, Okl., was with him on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

Standard Magnesium Corporation, herein called Standard, appeals from that portion of the judgment below against it in the sum of $5,734.95. The controversy arose out of a sale of certain government surplus material "generated" at Brookley Air Force Base at Mobile, Alabama. It was tried to the Court on an agreed statement of facts.

On January 16, 1952, the Government advertised for bids for, inter alia, "Wheels, misc. aircraft (salvage) where is, as is, 30,000 lbs." The defendant below Standard, bid $.204 per pound making the total bid price of $6,120. This was accepted. By the terms of the invitation to bid, Standard agreed to remove "all quantities of wheels, * * * generated during the life of the contract, where is, as is." The invitation expressly stated that the quantities available and listed of the items for sale "represent the estimated and not the actual amounts which will be available for delivery during the period stated. * * *"

Prior to submitting its bid Standard inspected part of the wheels offered for sale and found them to be of miscellaneous sizes and shapes, all of magnesium, with no more than 15% having steel brake drums attached and almost none with aluminum tire rims attached. The invitation to bid provided for such inspection, failure to inspect giving no ground for a claim. The invitation specifically provided that " * * * all property is sold 'as is'; the Government makes no guaranty, warranty, or representation, express or implied, as to the kind, size, weight, quality, character, description, or condition of the property, or its fitness for any use or purpose; this is not a sale by sample." The invitation also warned that "Items may be contaminated."

With this understanding Standard picked up 15,470 pounds of wheels on February 28. These conformed substantially to those inspected and Standard paid for them. The Government later notified Standard to pick up 37,000 pounds and, on April 8, 25,730 pounds were loaded and taken to Standard's Tulsa, Oklahoma, plant. There, upon inspection, it was discovered that all the wheels had steel brake drums and aluminum tire rims attached. The drums and rims were readily removable and constituted about 35% of the total weight. Standard protested that the wheels were "contaminated" and that "We do not expect an overage to the extent purchasing steel brake drums with the wheels." Although it recognized that " * * * the purchaser agrees to take all quantities generated", Standard refused to accept same with the drums and rims attached and offered to return the excess over the 30,000 pounds estimated but to accept such up to 30,000 pounds.

The Government refused this offer and notified Standard that the contract was terminated, and that all loss incurred in the disposal of the wheels "generated" during the contract term was to be Standard's responsibility. Due to an unexpected modification program not anticipated when the invitation was published, a total of 148,840 pounds was generated. The Government sold the undelivered poundage, 107,690 pounds, at the best price obtainable. It credited this receipt to the contract price due from Standard, and sued for the balance

and also for the purchase price of the 25,730 pounds delivered to Standard but yet unpaid for. This was recovered in the proceeding below and this appeal follows.

It is urged for reversal that the Court erred in failing to find that the Government had breached its contract in not delivering "wheels" as contemplated by the contract. It is Standard's position that "wheels" simply means wheels and not wheels with drums and rims. In the alternative, however, it urged that if the contract is deemed ambiguous in this respect it must be strongly construed against the party drafting it to the effect that the material furnished did not conform to the subject matter as described therein. Standard's further contention is that the 148,840 pounds "generated" by the Government, 118,840 pounds in excess of the estimate, is a breach of contract because the excess constitutes more than a reasonable variance from the amount estimated by the seller. The trial Court was of a contrary view and held that inasmuch as Standard had inspected a portion of the wheels, seeing that the drums and rims were attached, it was on notice that any or all wheels might be in such condition. Also the Court held that the amount contracted for was the amount "generated" and not the estimate and Standard was required to accept that amount or pay damages for its refusal.

It is apparent from the authorities that the usual Government surplus goods contract is not governed by the usual niceties of contract law. They are "where is, as is" sales with warranties and representations expressly negatived. Inspection prior to bidding is urged. The rule of caveat emptor in such sales "was certainly intended to be applied to the furthest limit that contract stipula-

tions could accomplish it."[1] The subject matter is necessarily described generally because it is considered as junk by the seller. The buyer has a fair opportunity to inspect, in order to decide whether to risk a purchase. In this case, Standard did inspect the wheels as the invitation urged. What it saw it accepted as wheels. The litigation here arose, however, only because they were contaminated in larger quantities than Standard found to be desirable. Standard had received over 15,000 pounds of wheels with brake drums and rims without protest. It was only when larger amounts of drums and rims than hoped for accompanied the deliveries that Standard concluded a proper definition of "wheels" did not include the attached items. The actions of the parties together with the entire description of wheels, including the adjectives "misc.", "(salvage)", "Items may be contaminated", lead to the conclusion that there was no uncertainty of subject matter.

There was, by no means, a ridiculous discrepancy between the goods tendered and the goods described; "This is not a case of ordering apples and getting oranges."[2] Of course, if the goods delivered were not in fact the goods contracted for, the buyer could not be held liable.[3] That determination however, is to a large degree a matter of fact dependent upon the precise provisions of the contract before the Court and the conduct of the parties in regard thereto and we cannot say the Court below erred in its conclusion. The description "Wheels, misc. aircraft (surplus) where is, as is", being purposefully general due to the nature of surplus sales transactions, was not inappropriate for this miscellaneous surplus equipment.

1. United States v. Silverton, 1 Cir., 1952, 200 F.2d 824, 827. See, also, Maguire & Co. v. United States, 1926, 273 U.S. 67, 47 S.Ct. 274, 71 L.Ed. 540; American Elastics v. United States, 2 Cir., 1951, 187 F.2d 109; United States v. Kelly, D.C.E.D.Mo.E.D.1953, 112 F.Supp. 831; Triad Corp. v. United States, 63 Ct.Cl. 151.

2. United States v. Silverton, supra, 200 F. 2d at page 828.

3. United States v. Koplin, D.C.N.D.Ga. 1928, 24 F.2d 840.

■ · The second question presented is, was Standard required to accept the 148,840 pounds, considerably in excess of the estimated 30,000 pounds, or pay damages for its refusal? It is agreed that the 30,000 pounds estimate in the contract was only an estimate and that the subject matter of the contract was that amount "generated" during the contract term. Therefore, the only question in such cases where the parties agreed to furnish and buy the buyer's requirements or, as here, to furnish and buy the seller's output, is whether the variance from the estimate is reasonable.[4] "Good faith was all that was required from the parties in making the estimate * * *."[5] As we said in M. W. Kellogg Co. v. Standard Steel Fabricating Co., 10 Cir., 1951, 189 F.2d 629, 632, 26 A.L.R.2d 1090, "The wide divergence in the estimate and the requirements is unexplained, but there is no allegation or proof of bad faith on the part of Kellogg as to the amount of steel it used." We, therefore, allowed the "wide divergence" in that case.

■ The divergence in this case is explained. It was due to an unexpected Government modification program. The fact that this increase was unexpected does not make it unreasonable, because by the terms of the contract unexpected increases or reductions in the amount generated compared to the estimates were contemplated.[6] This clearly indicates a warning to Standard that it must prepare itself for an innundation or drought of wheels, but whichever, both

parties contracted for the number actually generated. Consequently, although this divergence was unanticipated, Standard still was required to take what it contracted for, "Wheels, misc. * * * (salvage) where is, as is" and the amount actually generated. Some extreme variances could be held unreasonable, but taking all the facts and circumstances of this case into consideration, it cannot be said that the amount generated in fact excelled reasonable expectations under the contract and that good faith did not pervade the Government's actions.

Affirmed.

---

4. Fayette-Kenawha Coal Co. v. Lake & Export Coal Corp., 1922, 91 W.Va. 132, 112 S.E. 222, 227–228, 23 A.L.R. 565; Dawson Cotton Oil Co. v. Kenan, McKay & Speir, 1918, 21 Ga.App. 688, 94 S.E. 1037, 1040; Loeb v. Winnsboro Cotton Oil Co., Tex.Civ.App.1906, 93 S.W. 515.

5. Inman Bros. v. Dudley & Daniels Lumber Co., 6 Cir., 1906, 146 F. 449, 451.

6. The contract provided, "Quantity. The quantities of the various items listed are based upon the best information available and in any case represent the estimated and not the actual amounts which will

be available for delivery during the period stated herein. Except as otherwise stated herein, the fact that the specific quantities available for delivery vary from the quantities listed herein will not relieve the Government of its obligation to deliver to the purchaser the actual amount to be sold hereunder and will not release the purchaser from his obligation to purchase all such amounts.

"Items are for an indefinite quantity, however, amounts advertised are quantities anticipated and purchaser agrees to take all quantities generated during· the period of this contract."