# CHARLESTON.

## Virginia Iron, Coal & Coke Company v. Lake & Export Coal Corporation.

Submitted January 24, 1923.    Decided February 13, 1923.

1. Sales—*Telegraphic Offer and Acceptance for Shipment of Coal Held Binding.*

    Plaintiff wired defendant November 16, 1920: "Can offer subject prior sale hundred cars pools five or seven and fifty cars pool six prompt shipment for export six dollars mines." Defendant replied the following day: "We accept your offer one hundred cars pools five or seven and fifty cars pool six prompt shipment for export to Lambert's Point provided freight rate does not exceed two ninety gross ton.    Please wire us confirmation." The same day plaintiff answered: "Your wire:    Confirm sale hundred cars pools 5 or 7 and fifty cars pool 6, prompt shipment six dollars net ton mines. Wire Moore, Superintendent Transportation, Norfolk Western, classify our Toms Creek and Virginia City mines under your permit immediately. Answer." These messages constituted a binding contract between the parties for the coal referred to therein.    (p. 157)

2. Same—*Failure to Obtain Transportation Permit Held Breach of Contract for Purchase of Coal.*

    The message of defendant to plaintiff dated November 18, 1920, saying: "Moore Superintendent Transportation refuses give us permit therefore we cannot handle your coal," constituted a breach of said contract. The request of the plaintiff on November 17, that defendant apply for classification of its mines under defendant's permit, when under the rules and regulations of the railway company the permit called for was required of the defendant, did not introduce into the contract any new term requiring the assent of the defendant. (p. 157)

3. Same—*Refusal to Receive Coal Upon Which Freight Rate Exceeded That Stipulated in Contract Held Not Breach Thereof.*

    Under the terms of said contract no coal from plaintiff's mines could be included therein if the freight rate per ton therefrom exceeded two dollars and ninety cents, the sum specified in defendant's acceptance, and as to all coal bur-

dened with a rate exceeding that sum the defendant did not breach its contract by refusing to take the same, as the jury were properly told by instructions given at the instance of the defendant. (p. 158)

4. SAME—*Contract for Delivery of Coal Held to Include Only That Mined and Ready for Prompt Shipment at Date of Contract.*

The subject matter of the contract between the parties, evidenced by the telegrams referred to, none of the coal called for being then produced, was necessarily the coal which could be and was mined "for prompt shipment for export," as the contract stipulated, and the seller could not by extending its correspondence with defendant and obtaining from it reaffirmations of its declination to take the coal, apply the contract and its rights thereunder to other coal mined long afterwards and long after the time stipulated for the delivery of the coal purchased, and make its election to sell the coal subsequently mined as the coal of the purchaser and charge it with the difference between the contract price and the sum realized on such after mined coal. (p. 161)

5. SAME—*Measure of Damages for Breach of Coal Contract, Where Coal Sold by Plaintiff, Difference Between Contract Price and Value of the Coal Sold at the Mine.*

The plaintiff in this case having sold and disposed of the coal which must necessarily have been the subject of the contract between the parties as its coal and not that of the purchaser, the true measure of damages for defendant's breach of the contract was the difference between the contract price and the value of the coal so sold at the mine, the place of delivery and the place of the breach. (p. 162)

6. SAME—*Rule for Measure of Damages for Breach of Coal Contract Stated.*

Such being the true interpretation of the conduct of the plaintiff with respect to the coal which was the subject matter of the contract, the rule for the measure of damages applicable to some other state of facts could of course have no application to the fact in the case at bar. (p. 169)

Error to Circuit Court, Cabell County.

Action by the Virginia Iron, Coal & Coke Company against the Lake & Export Coal Corporation. From a judgment for plaintiff, defendant brings error.

*Reversed and remanded.*

*John H. Meek, Marcum & Marcum,* and *Holt, Duncan & Holt,* for plaintiff in error.

*Lewis A. Nuckols* and *Fitzpatrick, Brown & Davis,* for defendant in error.

MILLER, PRESIDENT:

In an action of assumpsit the plaintiff recovered a verdict and judgment against the defendant for $11,068.00, with interest and costs.

The contract out of which the alleged cause of action arose was contained in three telegrams interchanged between the parties, as follows:

> "Roanoke, Va., Nov. 16, 1920. Lake and Export Coal Co., Huntington, W. Va. Can offer subject prior sale hundred cars pool five or seven and fifty cars pool six prompt shipment for export six dollars mines. Answer quick if interested. (Signed) Virginia Iron, Coal & Coke Co."

> "Huntington, W. Va., Nov. 17, 1920. Virginia Iron, Coal & Coke Co., Roanoke, Va. Replying yours sixteenth we accept your offer one hundred cars pools five or seven and fifty cars pool six prompt shipment for export to Lambert's Point provided freight rate does not exceed two ninety gross ton. Please wire us confirmation. (Signed) Lake and Export Coal Corporation."

> "Roanoke, Va., Nov. 17, 1920. Lake & Export Coal Corporation, Huntington, W. Va. Your wire. Confirm sale hundred cars pools 5 or 7, and fifty cars pool 6, prompt shipment, six dollars net ton mines. Wire Moore, Superintendent Transportation, Norfolk Western, classify our Toms Creek and Virginia City mines under your permit immediately. Answer. (Signed) Virginia Iron, Coal & Coke Company."

In reply to the last telegram of plaintiff, defendant wired as follows:

> "Huntington, West Va., Nov. 18, 1920. Virginia Iron, Coal & Coke Co., Roanoke, Va. Moore Superin-

tendent Transportation refuses give us permit there-
fore we cannot handle your coal. (Signed) Lake &
Export Coal Corporation.''

. On November 19, 1920, plaintiff both wired and wrote de-
fendant, denying defendant's right to cancel the contract and
insisting that it comply therewith, to which defendant re-
plied on the same date.:

"We regret very much that our permit has been
cancelled on the N. & W., and it seems impossible for
us to secure a new permit. Under the circumstances
we cannot handle your coal.''

It is contended by the plaintiff that the evidence shows
that the cancellation of defendant's permit occurred
on November 6th, and that defendant knew this when
it accepted plaintiff's offer on November 17. De-
fendant admits knowledge of such cancellation, but repre-
sents what the evidence tends to show, that they were strug-
gling with the railroad authorities to get the permit re-
newed, and did on November 19th obtain a permit applic-
able to certain mines not including those of the plaintiff,
upon an application made on November 12th, before the
exchange of telegrams with plaintiff, begun on November 16th.
And it is shown that after obtaining the permit of November
19th, for the other mines, it subsequently made no applica-
tion for a permit to transport coal from plaintiff's mines be-
cause it had canceled the contract for that coal and had de-
clined to take the coal.

Notwithstanding defendant's positive declination to take
and handle plaintiff's coal, plaintiff wrote letters to defendant
November 23rd, December 7th and December 22, 1920, and
January 4, 1921, and afterwards, all apparently in an effort
to induce defendant to accept the coal covered by its contract.

The first proposition interposed by defendant's counsel in
the court below, and urged here on appeal, is the negative of
the proposition contained in plaintiff's instruction number
one given to the jury, namely, that the telegrams relied on
constituted no contract between the parties. This proposition
is based on the theory that by its telegram to defendant on

November 17th, requesting defendant to wire Moore, superintendent of transportation, to classify its Toms Creek and Virginia City mines under defendant's permit immediately, plaintiff thereby introduced a new term into the proposed contract, which defendant did not agree to and declined the coal.

By plaintiff's instruction number one the court rightfully told the jury, we think, that these telegrams as matter of law constituted a valid and binding contract. This proposition is questioned only upon the theory already alluded to, that the last of the three introduced a term or provision to which the defendant would not and did not agree, namely, that it should obtain from the railway company a classification of or permit to move the coal from plaintiff's mines. The contention of defendant was and is, that under embargo on coal No. 344, of the railway company, current at the time of the contract, it was the duty of plaintiff to secure the necessary classification of its mines and a permit to move the coal; while plaintiff's position is that under the embargo, the duty devolved upon defendant to at least obtain the permit. The evidence shows that plaintiff's mines had at the time of the contract already been classified, the Virginia City for Pool 6, and the Toms Creek operation for admission to Pools 5 and 7, run of mine, and that all that was lacking to move the coal promptly from the mines was a permit from the railway company for movement of the coal into these pools at Lambert's Point, Virginia, to obtain which, the shipper of the coal had to furnish certain information and data which was solely within the power of the defendant company, and with which the plaintiff could not possibly have been expected to comply.

The embargo upon which these questions seem to depend, Number 344, is as follows:

> "To Coal Shippers and Railway Employees Concerned:
>
> Effective 12:01 A. M., September 24th, 1920, embargo No. 328, issued July 29th, 1920, is superseded by the following:
>
> 93 W. Va.

EMBARGO 344.

Embargo is placed on coal consigned to Lambert Point, Va., for trans-shipment EXCEPT when authorized by numbered permit issued by E. S. Moore, Superintendent Transportation, N. & W. Ry., Roanoke, Va.

Application for permits must show:

(a) Quantity of coal to be shipped.

(b) Charter party reference or other satisfactory assurance that vessel tonnage to lift the coal will be supplied promptly when cargo assembled, the name of the vessel to be furnished as promptly as practicable.

(c) Amount of tonnage to be shipped from mines daily and names of mines from which will be shipped.

(d) Pool or pools in which coal will be shipped. Permits will not be issued:·

(1) When volume of shipment from mines will not admit of accumulating a cargo with sufficient promptness to avoid undue delay to car equipment.

(2) When shipments are to be made more than ten days in advance of expected arrival of vessel.

(3) When coal shipped for earlier cargo or cargoes has not been unloaded, due to failure of trans-shipper to provide vessel.

(4) When transportation conditions (road, yard or pier) will not admit of handling.

These regulations necessary to avoid congestion of yards and delay to car equipment.

E. S. MOORE,
Superintendent Transportation.''

The coal was sold according to plaintiff's proposal for pools 5, 6 and 7, prompt shipment, for export, at six dollars at the mines. The defendant in its acceptance designated Lambert's Point, provided the freight rate did not exceed the amount designated. The evidence shows that these pools were established by associations of shippers at several seaboard points, including Lambert's Point, Virginia, to facilitate handling coal and to avoid congestion of traffic, and that all were subject to the rules of the embargo by the railway company. It seems quite clear, nothing to the contrary being stipulated in the contract, that the information required for the movement of the coal from the mines necessarily would have to

come from the trans-shipper, and the defendant practically concedes this in its telegram of November 18th, attempting to cancel its contract, and excusing its action alone on the ground that it could not get the railway company to grant the permit. It does not seem to have occurred to defendant at the time to suggest to the plaintiff that the duty devolved upon the latter to secure such permit.

Respecting the second point of criticism of plaintiff's instruction number one, namely, that it covered the fifty cars of coal to come from plaintiff's Imperial mines, when the proof is that the freight rate from those mines, $3.00 per ton, eliminated that coal from the terms of the contract, two answers are applicable: First, that recovery on account of the supposed breach of defendant respecting that coal was conditioned on the jury finding that the rate did not exceed two dollars and ninety cents per ton. True there was no conflict in the evidence that the current rate from those mines to Lambert's Point was three dollars per ton, and the jury could not have found that the rate did not exceed two dollars and ninety cents: Second, the jury could not have in any way been misled by this feature of the instruction, because the jury were told by defendant's instruction number two, given, that plaintiff has no right to sell for defendant's account any coal it may have produced and sold from its Imperial mines, provided the freight rate therefrom exceeded two dollars and ninety cents per ton.

Complaint is next made of plaintiff's instruction number two. It rightly assumes that there was a valid and binding contract between the parties, and told the jury that before defendant could excuse its failure to take the 150 cars of coal contracted for, for want of a permit to move the same, the burden was upon it to establish that it had made application in accordance with the rules of the railway company for the issuance of such permit for the transportation of the coal from the mines of the plaintiff to Lambert's Point, and that such permit could not be obtained. As there was no conflict in the evidence that the rate from plaintiff's Imperial mines exceeded $2.90 per ton, this instruction could not have been made

to apply to the fifty cars from those mines, for defendant was not bound by the contract to take the coal from that operation, and was under no obligation to obtain a permit to do so. As to this error in the instruction, however, it was sufficiently cured by defendant's instruction number two. No doubt the duty was devolved upon defendant to apply for, and if possible obtain a permit from the railway company to move the coal from plaintiff's other mines producing coal for Pools 5 and 7, and without such effort or some good reason for its omission, it could not excuse its failure and its refusal to take the coal contracted for. It may rightfully be inferred from defendant's telegram of November 18th that it had made such application and had been refused, but as a matter of fact it had not done so. It seems to have assumed the railway company would refuse because of its persistency in refusing its application then outstanding for permit to move the coal from other mines. The defendant, apparently acting in good faith, was finding much difficulty in complying with the provisions of the Embargo No. 344. The condition of the coal market and the transportation facilities and the uncertainty of bottoms for export were quite abnormal. It was apparently difficult to assemble cargoes of coal for export with full assurances that vessels would be on hand to take them up within the time required by the rules of the railway company and of the coal association controlling the handling of coal delivered through these pools. Wherefore we think the jury might have been properly told in this instruction that they might consider the efforts of the defendant company detailed in the evidence, to obtain permits, on the question of its good faith in its dealings with the plaintiff company.

Before considering the question of the giving and refusing of the remaining instructions proposed on the trial, it is proper that we should state briefly the issues presented by the pleadings and the theories on which the case was tried to the jury. Breach of the contract was alleged, and as to the 100 cars for Pools 5 and 7, the breach was fully proven; but as to what were the respective rights and obligations of the parties arising out of this breach, they do not agree.

The theory of right on which plaintiff sought recovery

was stated in the third count of the declaration, namely, the sale and purchase of the 150 cars of coal, defendant's breach by refusing tc take and pay therefor, plaintiff's willingness to deliver and its tender of the same immediately after the making of said contract; that within a reasonable time thereafter plaintiff notified defendant that it would sell said coal upon the open market as defendant's coal to the best possible advantage and charge the latter with the difference between the price thus received and the contract price; and that thereafter it did sell 100 cars of coal containing 4500 tons at the average price of $3.11 per ton, and 50 cars containing 2250 tons at the average price of $3.25 per ton, and received therefor the aggregate price of $21,307.50, which sum was less than the contract price in the sum of $19,192.50, sought to be recovered as the damages sustained by defendant's breach of the contract.

The evidence does show that after defendant declined to take or handle plaintiff's coal, on November 18, 1920, plaintiff by a number of letters or telegrams sought to induce defendant to take the coal contracted for, but in every instance defendant repeated its purpose not to do so, and it was not until December 22, 1920, that plaintiff notified defendant by letter as follows:

> "I have written you several times in regard to the 150 cars of coal that you purchased from us on November 17th. This was an absolute sale, and unless you arrange to furnish us with shipping instructions on this tonnage in the next ten days we are going to sell same on the open market to the best possible advantage and charge your account with the difference in price received and the price at which you purchased this coal from us."

This letter was followed by one from D. D. Hull, Jr., vice-president and general counsel of the plaintiff company, dated January 4, 1921, referring to the contract and previous correspondence and defendant's refusal to take the coal, and saying:

> "I am. writing to advise you that we are going to forthwith dispose of this tonnage, which you are ob-

ligated to take, on the open market to the best advantage for your account, and will expect you to compensate us for any loss sustained by reason of your failure to comply with your contract of purchase. In the event you conclude to take any of this coal we shall, of course, be glad to deliver same to you at any time you request delivery before we have disposed of the tonnage for your account.''

This letter was answered by the defendant on January 8th following, saying: ''Our position in this matter has been fully covered by correspondence heretofore.''

It was not until September 16, 1921, that defendant, through a letter of Mr. L. A. Nuckles, general attorney for plaintiff, was notified of plaintiff's demand for damages, amounting to $19,258.75, and of plaintiff's intention to sue unless the claim was settled amicably.

The evidence shows that plaintiff had on hand practically no coal for delivery to defendant on the date of the contract, and that between November 17th and December 22nd, and afterwards, it went on mining coal and selling and delivering it to other persons, including deliveries to itself at its iron furnaces in Virginia; that not until December 22nd was defendant notified of plaintiff's intention to sell any coal on defendant's account; and that in truth and in fact no coal was mined or sold for defendant's account until after January 4th, and between January 5th and March 2, 1921, when the prices and market had fallen far below normal and below the prices prevailing at the time of the contract and for many days thereafter.

The evidence shows that between November 17th and 30th, 1920, inclusive, plaintiff mined and shipped from its Toms Creek mines on contract 12,704 tons, for spot, immediate delivery, 305 tons, and to its own operations 2,000 tons, aggregating 15,009 tons; that in December it mined and shipped from the same operation on contract 24,361 tons, spot 9,247 tons, and to its own works or operations 6,480 tons, aggregating 40,288 tons; that in January 1921 it mined and shipped from the same mines, for delivery on contract 20,590 tons, spot 5,220 tons, and to its own operations 5,453 tons, aggre-

gating 31,263 tons; that in February, 1921, it mined and shipped from the same place, on contract 13,090 tons, spot 3,615 tons, and to itself 3,615 tons, aggregating 20,380 tons. It was also proven that the coal shipped from the Virginia City mines between November 17th and 30th was, on contract 4,680, spot 316 tons, and to plaintiff's own works 600 tons, total 5,596 tons. Witnesses explained that "on contract" meant coal sold for extended delivery, and "spot" coal for immediate delivery; and it was shown by plaintiff's witnesses that the average price received for "spot" coal in November was about $5.50 per ton, and for the month of December from $4.00 to $4.50 per ton. This was for run of mine coal. For block coal from the Imperial mines for November the price averaged $6.50 per ton. Besides, though this fact may not be material, the evidence seems to show that during the months of November and December 1920, and January 1921, the coal mined and shipped from these points about, if not entirely, took all the cars to which plaintiff was entitled in the allotment of cars based on the capacity of its mines; and whatever coal it might have mined and shipped to defendant on its contract was presumably applied on running contracts or coal sold spot and delivered to itself as stated. Plaintiff's contention, however, is that much of the coal supplied to its own operations might very well have been employed in fulfillment of its contract with defendant. It seems to have elected, however, to treat that coal and all other coal mined in November, December and part of January as its own and not the coal of defendant, and having done so, it could recover as damages only its loss, if any, under the contract price.

Upon this state of the pleadings and the proof, defendant insists that plaintiff's instruction number four was erroneous, which told the jury in substance that if after November 17th and until plaintiff undertook to sell its product on defendant's account it was in correspondence with defendant, urging it to take and pay for said coal, then the fact that in the meantime the market price declined would not affect plaintiff's right if acting in good faith and in the exercise of reasonable discretion to make such re-sales upon the open market.

Against this instruction it is urged in argument: first, that its effect was to tell the jury that plaintiff might by correspondence after final breach and after the expiration of time for delivery of the coal, postpone its election to treat the coal as the coal of defendant, while plaintiff was bound to make its election immediately after final breach, whether it would treat the coal as its own or that of defendant, although in the event of its election to treat the coal as that of defendant, it might thereafter use reasonable discretion as to the time for the sale of the same for the account of defendant; second, that this instruction was erroneously made to apply to the fifty cars of coal from plaintiff's Imperial mines. To the extent that this instruction may have justified plaintiff in extending the time of its election beyond the final breach on November 18th by correspondence and in inducing repetition by defendant of its refusal to take the coal, we think it was erroneous. Defendant never waivered after its original breach on November 18th. At nearly every opportunity of the plaintiff it reiterated its positive refusal to take the coal. The coal plaintiff proposed to sell and the coal defendant proposed to buy was the 150 cars plaintiff had or could produce for prompt shipment for export. Coal for the purpose stipulated meant to plaintiff and defendant, being acquainted with Embargo 344, coal that could be produced and delivered at Lambert's Point within a very few days, not one month, two months or three months hence; and the subject of the contract between the parties plainly was the coal which plaintiff was intending to mine within that time, and it was this coal which, on defendant's breach, plaintiff was required within a reasonable time to elect either to treat as its own or that of defendant and to dispose of it accordingly. The coal which, beginning with January, plaintiff elected to sell for defendant's account could not have been the coal which defendant bought or plaintiff intended to sell when it communicated its proposition, which was accepted by defendant. Plaintiff's election must have had reference to the coal actually sold and purchased. If this were not so, plaintiff could have gone on from month to month with its letters and telegrams,

and by obtaining repetitions of defendant's declination postponed its election, until by falling prices the defendant might have been mulcted in damages far in excess of its legal liability under the contract.   Of course this instruction was erroneous in including within its terms, coal mined and sold from plaintiff's Imperial mines, for reasons already assigned in criticism of other instructions.   Plaintiff's instructions numbers five and six, which were not objected to, stated the rights of plaintiff to elect in more general terms, and the propositions therein, if understood by the jury and properly applied to the facts in evidence, covered the whole case properly presented to the jury.

Justification for the propositions offered in plaintiff's instruction number four, which, it is argued, must be read in connection with defendant's instruction number four and its instruction number six, was predicated on the rules and principles enunciated in *American Canning Co.* v. *Flat Top Grocery Co.*, 68 W. Va. 698; *Rosenbaums* v. *Weeden, Johnson & Co.*, 18 Gratt. 785; and *American Hide & Leather Co.* v. *Chalkley,* 101 Va. 458.   We do not think these cases have controlling influence in the decision of the present case, nor do we think they support the theory of instruction number four now under consideration.   In the first case, the goods which were the subject of the contract had not been produced, but at the breach they had been manufactured, and they were the goods that were held and sold for defendant's account.   In the Grattan case the goods—cotton goods—were shipped to defendants and by them returned, and were thereafter held and treated by plaintiff as the goods of the defendants and sold for their account within the time which under all the circumstances was regarded reasonable, and after reasonable notice to the buyers.   In the case here, the coal produced, which must have gone to defendant and must have been the subject of the contract between the parties, was treated as the coal of plaintiff and disposed of as such.   The plaintiff could not thereafter elect to treat the later product of its mines as defendant's coal and impose upon it damages measured by the difference between the contract price and the

price realized on the product of its mines, which defendant had not contracted for.

The actual facts we are dealing with here are that the coal which the defendant contracted for was sold and disposed of by the plaintiff as its coal. The cases cited do hold, and properly so, that the goods sold need not have been manufactured at the date of the contract, but if when manufactured and tendered, the buyer breaches the contract, and the seller elects, as he may, to treat the contract as broken and to sell the goods as his own, the election must be as to the very goods contracted for, and there is no room for the application of any rules except those applicable in such cases. In the American Canning Company case, the contract was for goods to be manufactured, but the plaintiff's election was as to the goods actually produced and sold, not to some other lot or class of goods.

We are next to consider the rulings of the court respecting defendant's instructions numbers 1 and 3. Number one assumes that defendant was unable to procure a permit to move the coal into the pools as contemplated, excusing performance of the contract on its part. The instruction was likely rejected for want of evidence to support it. There was no specific application by defendant for such permit; but the evidence tends to show that if one had been applied for, it would have been granted as early as November 18th. Little is said in support of this instruction by defendant's counsel. We can not say the court erred in rejecting it, considering the case actually made out and submitted to the jury.

The most important question arising in the case is that of the true measure of damages resulting from the breach of the contract by defendant. If, as we hold, plaintiff must be regarded as having elected to treat the coal which under the contract must have gone to defendant as its own coal, and as having disposed of it as such, the true measure of damages was the difference between the contract price and the value thereof at the mine, the place of the breach by defendant. This was the proposition presented by defendant's instruction number three which we think should have been given.

It is supported, we think, by *Acme Food Co.* v. *Older,* 64 W. Va.. 255; *Duquesne Lumber Co.* v. *Keystone Mfg. Co.,* 90 W. Va. 673; and by *Fayette-Kanawha Coal Co.* v. *Lake & Export Coal Corp.,* 91 W. Va. 132, 112 S. E. 222.

It is said, however, by plaintiff's counsel that the verdict and judgment may be supported by another rule for measuring plaintiff's damages, namely, that in the case of a breach by the buyer of such product, the seller may, the coal not having been produced at the time of the breach, recover the difference between the contract price and what would have been expended in the production thereof, and for which proposition we are cited to Williston on Contracts, §1380. And it is said that as the evidence contains the data upon which to base a verdict upon this theory, it should not be set aside or the judgment thereon reversed. But assuming the correctness of this proposition to the facts supposed, the answer is that the plaintiff presented no such case to the jury. The proper interpretation of the facts is that the only coal which plaintiff produced which could have been delivered to defendant in fulfillment of its contract, it elected by its own conduct to treat as its own and to sell or dispose of it as such; and we must apply the rule for the measure of damages to facts proven.

Enough has been said to indicate our opinion on the questions actually involved and to justify our conclusion to reverse the judgment, set aside the verdict, and to remand the case to the circuit court for a new trial.

*Reversed and remanded.*